**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| STRAITS FINANCIAL LLC, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| TEN SLEEP CATTLE CO., and RICHARD CARTER, | ) |
|  | ) |
| Defendants. | ) |
|  | ) |
| TEN SLEEP CATTLE CO., | ) |
|  | ) |
| Counter-Plaintiff and Third-Party Plaintiff, | ) Case No. 1:12-cv-06110 |
|  | ) |
| vs. | ) Honorable James B. Zagel |
|  | ) |
| STRAITS FINANCIAL LLC, | ) |
|  | ) |
| Counter-Defendant | ) |
|  | ) |
| and | ) |
|  | ) |
| JASON PERKINS, | ) |
|  | ) |
| Third-Party Defendant. | ) |
|  | ) |

**TEN SLEEP CATTLE CO.'S AND RICHARD CARTER'S TRIAL BRIEF**

This is an unauthorized trading case. Ten Sleep Cattle Co., a Wyoming-based cattle ranching operation, lost over $2,000,000 when its broker, Jason Perkins, an employee, manager and associated person of Straits Financial LLC, embarked on a trading spree in U.S. Treasury bond futures contracts that garnered Perkins and Straits over $60,000 in commissions in just three months. Perkins' scheme fell apart when he ran out of Ten Sleep's money and created a

shortfall in Ten Sleep's accounts of $168,000. When Ten Sleep first learned about the losses, Perkins admitted his wrongdoing and even signed an affidavit to that effect. Ten Sleep seeks to recoup its $2 million in unauthorized trading losses. Straits, on the other hand, stands by its former employee and seeks to force Ten Sleep to make up the $168,000 shortfall Perkins created.

### BACKGROUND FACTS

In March 2010, Ten Sleep opened a hedge account with futures commission merchant R.J. O'Brien ("RJO") and its guaranteed introducing broker, Jason Perkins. In connection with opening the account, Ten Sleep entered into an account agreement with RJO that contained, among other things, a personal guaranty signed by Ten Sleep's president, Richard Carter. Neither Ten Sleep nor Carter, who has a high school education, had any experience trading futures contracts or even buying and selling securities.

In April 2011, Perkins decided to leave R.J. O'Brien and move his customers and their accounts to Straits, where he became an employee, associated person and branch manager. RJO sent Perkins' customers a letter advising that the "account will be transferred to Straits" within ten days unless Ten Sleep instructed RJO otherwise. There is no evidence that Ten Sleep received the letter. Since Ten Sleep did not object, all positions and cash in Ten Sleep's account transferred to Straits. Ten Sleep never signed an account agreement with Straits.

Shortly after Perkins moved to Straits, he convinced Carter to open another account for the purpose of speculative trading (the "Speculative Account"). Perkins proposed, and Carter orally agreed, that Perkins would have discretion to trade the Speculative Account without contacting Carter for prior authorization, and that they would split the profits from the speculative trading. Unbeknownst to Carter, Perkins' proposal violated industry rules and regulations, as well as Straits' written policies. Although Carter was initially reluctant, he

ultimately agreed to Perkins' proposal, based in large part on Perkins' promise that he would "pick around the edges" and that there would be no margin calls in the Speculative Account.

On or about March 16, 2012, Perkins informed Carter that he had generated $300,000 in trading profits in the Speculative Account. Since this was way beyond the amount that Carter thought Perkins would be trading, Carter instructed Perkins to stop trading and send a check for $300,000. Ten Sleep then sent Perkins a check for $150,000, understanding that there would be no more trading in the speculative account. However, the very next business day, Perkins resumed trading in the Speculative Account without telling Carter or getting his authorization. By June 19, 2012, Perkins had racked up over $2,000,000 in losses in the Speculative Account. To cover that loss, Straits appropriated all of the equity in Ten Sleep's hedge account— $1,823,167.77—leaving a shortfall of $168,877.02.

Upon learning what Perkins had done, Carter demanded a meeting with him in Casper, Wyoming. The meeting took place at Carter's lawyer's office on June 25, 2012. Altogether, there were five people at the meeting. During the meeting, Perkins admitted that he had continued to trade the Speculative Account without Carter's knowledge. He signed an affidavit attesting to what he had done.

### LEGAL ANALYSIS

## I.     STRAITS AND PERKINS ARE LIABLE FOR UNAUTHORIZED TRADING UNDER THE COMMODITIES EXCHANGE ACT.

The Commodities Exchange Act "makes it unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery made … for or on behalf of any other person … (A) to cheat or defraud or such other person …." *Prestwick Capital Management Ltd. v. Peregrine Fin. Group Inc.*, No. 10 C 23, 2010 WL 4684038 *3 (N.D. Ill. Nov. 1, 2010) (citing section 4b of the Commodities Exchange Act, 7

U.S.C. § 6b). Knowing and deliberate execution of unauthorized trades, even if done without an evil motive or intent to injure the customer, violates the Commodities Exchange Act. *Id*.; *see also Cange v. Stotler & Co., Inc.*, 826 F.2d 581, 589 (7th Cir. 1987). Whether Ten Sleep gave Perkins oral permission to trade the account is irrelevant, because under CFTC Rule 166.2, a customer's oral grant of discretion is void. *Adams v. Black Diamond Futures & Trading, Inc.*, No. 04-R052, 2007 WL 1110753, *3 (C.F.T.C. April 11, 2007).

Moreover, the Act makes brokerage firms vicariously liable for the violations of their agents, whether authorized or not, as long as the agent was "acting for" the firm at the time. *Evanston Bank v. Conticommodity Services, Inc.*, 623 F. Supp. 1014, 1023 (N.D. Ill. 1985); *see* 7 U.S.C. §2(a)(1)(b). The fact that the agent's actions are illegal and fraudulent does not relieve the futures commission merchant of civil liability under the Commodities Exchange Act. *Cange*, 826 F.2d at 589.

Perkins was an employee, branch manager and associated person of Straits. By his own admission, he traded Ten Sleep's account without Carter's knowledge or consent, and never told Carter that he had lost over $2,000,000 of Ten Sleep's money. Perkins' actions constitute fraud under the Commodities Exchange Act, and Straits is strictly liable for Perkins' fraud. *Anspacher & Assocs., Inc. v. Henderson*, 854 F.2d 941, 945 (7th Cir. 1988).

## II.    STRAITS AND PERKINS ARE LIABLE FOR BREACH OF FIDUCIARY DUTY.

In addition to their obligations under the Commodities Exchange Act, Straits and Perkins owed Ten Sleep a duty to properly execute Ten Sleep's transactions in accordance with its instructions. *Id*. at 945. In addition, a broker may become the fiduciary of his customer when he handles a discretionary account or usurps actual control over a technically non-discretionary account. *Martin v. Heinold Commodities, Inc.*, 487 N.E.2d 1098, 1101-02 (1985) (reversed on other grounds).

4

It is irrelevant that Ten Sleep gave Perkins unwritten discretionary authority to trade the Speculative Account, because that agreement is void under CFTC Rule 166.2. Regardless, Ten Sleep revoked that authority on March 16. Perkins continued to exert control over the account anyway. Thus, Perkins breached his fiduciary duty to Ten Sleep when he disregarded Carter's instructions to stop trading, embarked on an unauthorized trading spree with Ten Sleep's funds, and failed to disclose that he had racked up $2,000,000 in losses. *See Prestwick Capital*, 2010 WL 4684038 at *5; *Anspacher*, 854 F.2d at 945; *Evanston Bank*, 623 F. Supp. at 1023-24 (a conscious decision not to disclose an objectively obvious danger to a client is reckless non-disclosure, which for a fiduciary amounts to misrepresentation or deceit).

Straits employed Perkins to trade commodities and generate commissions. As such, Ten Sleep's losses from Perkins' unauthorized trading stem from the scope of his employment. *Id.* at 1030; *see also Cange*, 826 F.2d at 589-90 (unauthorized trades presumed to be within scope of broker's agency). Straits is therefore liable under the doctrine of *respondeat superior* for Perkins' unauthorized trading, even if Straits is not at fault. *See Rosenthal & Co. v. Comm. Futures Trading Com'n*, 802 F.2d 963, 966 (7th Cir. 1986).

## III.  STRAITS AND PERKINS ARE LIABLE UNDER THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE PRACTICES ACT.

A claim under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*, consists of: (i) a deceptive act or practice, (ii) intent on the defendant's part that the plaintiff rely on the deception, (iii) the deception occurred in the course of trade and business, and (iv) actual damage to the plaintiff, which (v) was proximately caused by the deception. Intent to deceive is not an element; it is sufficient that the defendant intended to induce reliance on the misinformation. *Cuculich v. Thomson Consumer Electronics, Inc.,* 739 N.E.2d 934, 939 (Ill. App. 2000). Violations of the federal securities and commodities laws are

presumed to injure the public and thus come under the purview of the Consumer Fraud Act. *Campbell v. Moseley*, *Hallgarten, Estabrook & Weeden Inc.*, No. 84 C 9194, 1985 WL 1799, \*7 (N.D. Ill. June 10, 1985) (citing *Heinold Commodities v. McCarty*, 513 F. Supp. 311, 312-13 (N.D. Ill. 1979)).

A nonresident plaintiff may pursue a private cause of action under the Consumer Fraud Act if the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois. *Avery v. State Farm Mut. Auto. Ins. Co.,* 835 N.E.2d 801, 854 (2005). As this Court previously held in denying Carter's motion to dismiss for lack of personal jurisdiction, the "real object of the business transaction" at issue took place entirely within Illinois. [Dkt. #39 at 8.] As such, Ten Sleep is entitled to pursue its Consumer Fraud Act claim.

## IV.   STRAITS AND PERKINS HAVE BEEN UNJUSTLY ENRICHED BY PERKINS' UNAUTHORIZED TRADING SCHEME.

A defendant is unjustly enriched when he retains a benefit to plaintiff's detriment and his retention of that benefit violates the fundamental principles of justice, equity and good conscience. *Zurich Capital Markets v. Coglianese*, 332 F. Supp. 2d 1087, 1119 (N.D. Ill. 2004). Fraud, if proved, constitutes unjust enrichment. *Gondeck v. A Clear Title & Escrow Exchange, LLC*, No. 11 C 6341, 2012 WL 5200091, \*6 (N.D. Ill. Oct. 22, 2012).

Straits confiscated all of the excess equity in Ten Sleep's hedge account to cover the losses its employee caused through unauthorized trading. In addition, Straits (and Perkins) collected tens of thousands of dollars of commissions on the unauthorized trades. They should not be allowed to retain the benefits of their fraudulent conduct.

## V.   STRAITS IS LIABLE FOR CONVERSION.

Conversion is an unauthorized act which permanently deprives an owner of his right to property. *Travelers Cas. & Sur. Co. v. Paderta*, No. 10 C 0406, 2010 WL 5419065, \*4 (N.D. Ill.

Dec. 23, 2010). While an action for the conversion of funds may not be maintained to satisfy a mere obligation to pay money, money may be the subject of conversion when account funds are specifically identifiable from funds constituting general debt. *Id*. In addition to showing that funds constitute "specific chattel," it must be shown that the money claimed at all times belonged to the plaintiff and that the defendant converted it to its own use. *Id.* *5.

The funds in Ten Sleep's hedge account were by definition segregated funds that belonged to Ten Sleep. Straits confiscated those funds to cover Perkins' unauthorized trading losses. Straits' actions constitute conversion.

## VI. STRAITS CANNOT ESTABLISH THAT TEN SLEEP IS BOUND BY THE RJO ACCOUNT AGREEMENT OR RATIFIED THE UNAUTHORIZED TRADES.

Straits' defense to all of Ten Sleep's claims is rooted in the same contract that forms the basis of its breach of contract claim. But in order to prevail on its contract defenses or its contract claim, Straits must prove that a valid contract existed between Straits and Ten Sleep. It is undisputed that Ten Sleep never signed a new account agreement with Straits. Therefore, Straits must establish that RJO validly assigned the Ten Sleep account agreement to Straits. Straits cannot meet this burden.

Under Illinois law, an assignment may be barred if it would materially change the duties of the obligor, increase the obligor's risk, or impair the obligor's chance of obtaining return performance. *Piasecki v. Liberty Life Assur. Co.*, 728 N.E.2d 71, 73 (Ill. App. 2000). Here, the RJO account agreement does not state that the contract itself is assignable; it merely says that Ten Sleep's *account* might be transferred under certain circumstances. Tracking that language, the letter RJO sent to Perkins' clients merely stated that their accounts would be transferred to Straits. It says nothing about the parties' contracts—including any personal guaranties—being

assigned to Straits. Thus, as far as Carter and Ten Sleep were concerned, only the open positions and cash in its account were transferred to Straits.

More importantly, Ten Sleep was never notified that the RJO account agreement was purportedly assigned to Straits.[1] At the time of the purported assignment, Ten Sleep maintained only a hedge account. When Ten Sleep agreed to open the Speculative Account at Straits, it had no way of knowing that Straits intended to enforce the terms of the RJO account agreement, such as the right to offset deficits in one account with the equity of another. This constituted a material increase in the risk to Ten Sleep. *See Southern Wine & Spirits v. Steiner*, No. 1-12-3435, 2014 IL App. (1st) 123435, ¶ 21 (Mar. 31, 2014) (invalidating assignment where guarantor had no knowledge of assignment or that he was incurring any risk when purchasing goods from assignee).

Indeed, it would be illogical to hold that Straits had the right to enforce the terms of the RJO account agreement against Ten Sleep. For example, the RJO account agreement states that trades would be considered ratified unless the customer followed some convoluted instructions on when and how to inform RJO's compliance department about trade discrepancies. In contrast, Straits *never* gave Ten Sleep any such instructions. Nevertheless, Straits relies upon the RJO account agreement to claim the unauthorized trades are deemed ratified, even though that agreement only tells the customer how to contact the RJO compliance department. Straits cannot rationally explain how Ten Sleep's failure to notify RJO's compliance department about unauthorized trading at Straits constitutes ratification.

Since Straits cannot rely on the assignment to argue that Ten Sleep is bound by its terms, it is left to argue that Ten Sleep ratified the contract (and the trades) under a theory of common

---

[1] Ten Sleep acknowledges it was aware its account had been transferred to Straits, which is far different than knowing its contract had been assigned to Straits.

8

law ratification. But Straits' reliance on common law ratification is misplaced, because "the purpose of the doctrine is to protect innocent third parties, not parties who share responsibility for the loss." *Evanston Bank*, 623 F. Supp. at 1034. As Perkins' employer, Straits bears responsibility for his actions, and thus cannot be considered an innocent third party.

Moreover, ratification from silence will only be found when a party, with full knowledge of all material facts, conducts himself in a manner inconsistent with repudiation of his agent's transaction, and a third party relies on that conduct to his detriment. *Id*. As such, when considering whether ratification has been established, "the first step is to examine whether the customer knew of the agent's wrongdoing and that she had the legal right to void the unauthorized trades *Adams*, 2007 WL 1110753 at *3 (reversing finding that customer ratified unauthorized transactions because she did not know until after her account was closed that the broker should have obtained written discretionary authority or her prior consent to each trade). Here, Carter had no knowledge that Perkins continued to trade in the Speculative Account after he instructed him to stop. Because Carter was not aware of any of these material facts and there is no innocent third party that relied on, or was damaged by, his silence, Straits cannot establish ratification by silence. *See Evanston Bank*, 623 F. Supp. at 1037 (failure to object is not necessarily to be interpreted as intent to ratify, when other reasons could explain the principal's actions).

Finally, even if the Court were to disregard the fact that RJO and Straits never notified Ten Sleep or Carter that they had entered into an assignment agreement, it would be unconscionable to enforce the terms of the RJO account agreement against Ten Sleep or Carter. An agreement can be either procedurally or substantively unconscionable, or a combination of the two. *Kinkel v. Cingular Wireless LLC*, 857 N.E.2d 250, 271 (Ill. 2005); *see also Wigginton v.*

*Dell, Inc.*, 890 N.E.2d 541, 544 (Ill. App. 2008). Procedural unconscionability relates to the circumstances surrounding the formation of the contract, such as where a term is so difficult to find, read or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it, whereas substantive unconscionability deals with the fairness of the provision itself, *i.e.*, where terms which are inordinately one-sided in one party's favor. *Kinkel*, 857 N.E.2d at 267. Given the limited language of the assignment provision in the RJO Agreement and the lack of notice to Ten Sleep that the contract had purportedly been assigned, it would be unconscionable to hold Ten Sleep bound by the terms of the RJO contract.

## VII.   **STRAITS CANNOT ENFORCE THE PERSONAL GUARANTY.**

Likewise, to prevail on its claim for breach of the guaranty against Carter, Straits must prove the existence of a valid contract between itself and Carter. As argued above, Straits did not acquire RJO's rights under the RJO account agreement. But even if Straits could somehow establish that RJO validly assigned the account agreement, it still could not enforce the personal guaranty. Under Illinois law, the general rule is that guaranties are not assignable. *Southern Wine* 2014 IL App. (1st) 123435 at ¶ 18. An assignment of a guaranty will not release the guarantor unless the essentials of the original contract have been changed and the performance required of the principal is materially different than first contemplated. *Id*. When the guarantor is not informed of the assignment, it can be a factor regarding whether the guaranty has been materially changed. *Id*. ¶ 20. Even more significant to the analysis is whether the assignment subjects the guarantor to more risk. *Id*. ¶ 21.

Here, Carter was never notified that his guaranty was assigned to Straits. Thus, he was unaware that he was incurring any risk when Ten Sleep opened the Speculative Account at Straits. *See Southern Wine*, 2014 Ill. App. (1st) 123435 at ¶ 21. Accordingly, the guaranty should not be enforced against Carter.

10

CONCLUSION

For the foregoing reasons, Ten Sleep Cattle Co. and Richard Carter request that judgment be entered in their favor and against Straits Financial, LLC and Jason Perkins, in an amount to be proved at trial, and for such other and further relief as the Court deems fair and just.

Dated: August 28, 2014                                      Respectfully submitted,


                                                            /s/ Nancy L. Hendrickson
                                                            One of the attorneys for Ten Sleep Cattle
                                                            Co. and Richard Carter

Nancy L. Hendrickson
ARDC No. 6207710
HENDRICKSON LAW FIRM
203 N. LaSalle Street, Suite 1620
Chicago, IL 60601
(312) 332-0855
nancy@hendricksonlawfirm.com

11

## <u>CERTIFICATE OF SERVICE</u>

      Nancy L. Hendrickson, an attorney, hereby certifies that on August 28, 2014, she caused a copy of ***Ten Sleep Cattle Company's and Richard Carter's Trial Brief*** to be served via the Court's ECF/electronic mailing system upon:

      Howard J. Stein
      Attorney at Law
      70 West Madison Street
      Suite 2100
      Chicago, IL 60602
      <u>hsteinlaw@aol.com</u>


      James McGurk
      10 South LaSalle Street
      Suite 3300
      Chicago, IL 60603
      <u>jamcgurk@flash.net</u>



                         <u>/s/ Nancy L. Hendrickson</u>