**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| STRAITS FINANCIAL LLC, | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| TEN SLEEP CATTLE CO. and RICHARD CARTER, | ) | |
| Defendants. | ) | |
| | ) | |
| TEN SLEEP CATTLE CO., | ) | |
| Counter-Plaintiff and Third-Party Plaintiff, | ) | Case No. 1:12-cv-06110 |
| v. | ) | Honorable James B. Zagel |
| STRAITS FINANCIAL LLC, | ) | |
| Counter-Defendant | ) | |
| and | ) | |
| JASON PERKINS, | ) | |
| Third-Party Defendant. | ) | |

<u>**STRAITS FINANCIAL LLC'S POST-TRIAL BRIEF ON ASSIGNMENT ISSUES**</u>

Straits Financial LLC ("Straits"), by its attorney, submits the following Post-Trial

Brief on issues involving the assignment to Straits of the Account Agreement signed by

Ten Sleep Cattle Co. ("Ten Sleep") with RJ O'Brien ("RJO").

It is undisputed that on March 4, 2010, Ten Sleep, through its president Richard

Carter ("Carter"), executed an Account Agreement with RJO [Joint Exhibit 1 at TS

1

EXHIBIT 1

000250-280] and that the Account Agreement included a personal Guaranty by Carter of any debts owed by Ten Sleep to RJO [Joint Exhibit 1 at TS 000268]. It is also undisputed that RJO assigned to Straits the Ten Sleep Account Agreement, together with the agreements of other accounts introduced by Perkins Commodities LLC, by virtue of an Assignment Agreement dated April 22, 2011 [Joint Exhibit 4].

## I. THE CUSTOMER AGREEMENT SPECIFICALLY ALLOWS ASSIGNMENT

### A. PARAGRAPH 23 OF THE ACCOUNT AGREEMENT

Paragraph 23 of the Account Agreement, Joint Exhibit 1 at TENS 000263, provides, in relevant part:

> ... Any rights that Customer may have pursuant to this Agreement shall not be assigned, transferred, sold or otherwise conveyed by Customer to another party. Under certain circumstances, RJO may, subject to exchange, National Futures Association ("NFA") or Commodity Futures Trading Commission ("CFTC") rules, assign this account to another duly registered Futures Commission Merchant ("FCM").

Straits submits that the intent of this provision is to allow RJO to assign not only the Ten Sleep account but also the Ten Sleep Account Agreement to Straits. Ten Sleep argued that this language only permits assignment of Ten Sleep's account.

In the context of this paragraph, where the discussion of assignment to another FCM immediately follows a prohibition on Ten Sleep's ability to assign or transfer the Account Agreement to another party, it can be inferred that the parties intended to allow RJO to assign the Account Agreement, while prohibiting Ten Sleep from doing so. RJO's intent to allow this can be gleaned from the fact that it assigned the Account Agreement to Straits. There was no evidence of Ten Sleep's intent to the contrary.

Moreover, this is how Ten Sleep viewed this provision until the trial. On August 9, 2012, Carter filed a Motion to Dismiss Straits' Complaint against him personally based

2

on his Guaranty, arguing, <u>inter alia</u>, that the Illinois choice of law provision in the Account Agreement [Joint Exhibit 1 at TENS 000262-63] did not govern because his Guaranty "was not assignable, and therefore was not assigned, from R.J. O'Brien when R.J. O'Brien assigned the Customer Agreement to Straits". [Docket #28 at Page ID #228]. Nowhere in his Motion to Dismiss or in his supporting Memoranda did Carter argue that Paragraph 23 only applied to Ten Sleep's account, not to the Account Agreement itself. This is despite the fact that Straits' Opposition to the Motion to Dismiss [Docket #17 at Page ID#179] cited the aforesaid language as part of its argument that the Guaranty, as well as the Account Agreement as a whole, had been assigned to Straits and therefore was governed by Illinois law as provided in paragraph 15 of the Account Agreement [Joint Exhibit 1 at TENS 000261][1]

Tellingly, Ten Sleep itself did not contest the assignment of the RJO Account Agreement to Straits by filing its own Motion to Dismiss and arguing, as it now does, that the provision did not allow assignment of the Account Agreement itself.

This Court should therefore reject Ten Sleep's and Carter's newly-created argument that the Account Agreement was not validly assigned.

## B. PARAGRAPH 18 OF THE CUSTOMER AGREEMENT ALSO PROVIDED FOR ASSIGNMENT OF THE CUSTOMER AGREEMENT

Paragraph 18 of the Account Agreement, Joint Exhibit 1 at TENS 000262, provides, in relevant part:

> …This Agreement shall be binding upon Customer's personal representatives and legal successors, and shall inure to the benefit of RJO's successors by merger, assignment, consolidation or otherwise….

---

[1] This Court also cited the aforesaid language of paragraph 23 in its Order denying Carter's Motion to Dismiss, Docket #39 at p.2.

By specifically allowing for assignment of the Account Agreement, the provision provides further evidence of the parties' intent to allow the Account Agreement to be assignable, makes the Account Agreement applicable to Straits by way of the Assignment Agreement between Straits and RJO, and at least constructively if not actually puts Ten Sleep on notice that the Account Agreement itself may be assigned to another party.[2]

## II. ILLINOIS LAW ALLOWS THE ASSIGNMENT OF THE ACCOUNT AGREEMENT

Under Illinois law, a contract or contractual right can be assigned unless the assignment materially changes the duties of the obligor, increases the obligor's risk, impairs the obligor's chance of obtaining return performance, materially reduces the value of the contract to the obligor, is forbidden by statute or public policy, or is validly precluded by the contract. Restatement (Second) of the Law-Contracts at §317(2).

None of these conditions are present in this case. The assignment of the Account Agreement from RJO to Straits did not change Ten Sleep's obligations under the Account Agreement in any material way.[3] Ten Sleep's positions remained the same as they had before the assignment; the cash in its account remained the same; its broker [Perkins] remained the same; Straits did not charge Ten Sleep any cost in connection with the assignment; the value of the Account Agreement to Ten Sleep remained the same; no provisions of the Account Agreement were materially altered in any way; no public policy reason or statute bars the assignment; and the Account Agreement itself certainly does not prohibit its assignment. As this Court noted in denying Carter's Motion to

---

[2] Having signed the Customer Agreement, Ten Sleep cannot argue that it is unaware of or does not understand its provisions. Ten Sleep is bound by these provisions. Carr v. CIGNA Securities, Inc., 95 F. 3d 544 (7th Cir. 1996); Urban Sites of Chicago, LLC v. Crown Castle USA, 979 N.E. 2d 480, 493 (1st Dist. 2012).
[3] Carter's argument that his Guaranty cannot be assigned for this reason will be dealt with below.

Dismiss, Ten Sleep and Carter have never alleged that either material terms of the Customer Agreement or Ten Sleep's performance requirement were altered when RJO assigned the Customer Agreement to Straits. [Docket #39 at Page ID#296].

Moreover, the evidence is undisputed that Ten Sleep received benefit from the assignment in that it continued to receive, in its undisputed "33 account", lower "hedge margin" rates based on the RJO Hedge Representation letter. [Joint Exhibit 1 at TENS 000269].

The only real argument Ten Sleep makes in its attempt to invalidate the assignment of the Account Agreement on these grounds is that, by signing the Related Account Authorization [Joint Exhibit 7], Ten Sleep's risks increased dramatically because Straits was able to offset the loss in the new "35" account with monies from the "33" account.[4] However, Ten Sleep's execution of the Related Account Agreement and its opening of the "35" account occurred after the assignment of the Account Agreement. That is why the Related Account Agreement refers to account documentation "maintained and existing on file with Straits". It is a separate matter of contract law, having nothing to do with the validity of the Assignment Agreement itself, whether the Related Account Authorization is a valid contract between Straits and Ten Sleep.[5]

---

[4] Straits did not need the Account Agreement to effectuate the offset. It presented uncontradicted evidence that industry practice, CME rules and the NFA's Joint Audit Committee Guidelines all require FCMs to cross-margin and cross-collateralize accounts owned by the same account holder.

[5] The Related Account Agreement is a valid contract. There is clearly offer, acceptance, consent, consideration (opening a second account in exchange for using the existing account documentation), a clear and definite subject matter and all other required elements of a contract. All American Roofing, Inc. v. Zurich American Insurance Co., 404 Ill. App. 3d 438, 934 N.E. 2d 679, 689 (1st Dist. 2010). As noted above, having signed the Related Account Authorization, and with Carter having admitted he understood its language, Ten Sleep is bound by its terms. Indeed, Ten Sleep and Carter have never argued that the Authorization itself is not a binding agreement. Their argument is that because the RJO Account Agreement is invalid, Straits cannot rely on it to offset losses in the 35 account with monies in the 33 account.

## III. NEITHER THE ACCOUNT AGREEMENT NOR ILLINOIS LAW REQUIRES NOTICE OF THE ASSIGNMENT TO TEN SLEEP

Ten Sleep depends heavily upon its argument that Ten Sleep did not receive notice of the Assignment of the Account Agreement. Section IV of this Brief will deal with the evidence presented at trial on this point. However, there is simply no requirement under the Account Agreement or under Illinois law that notice of an assignment must be given to the other party to the agreement, in this case, Ten Sleep, for the assignment to be valid.

The Account Agreement contains no provisions requiring notice of assignment of the Customer Agreement to be given to Ten Sleep.

Under Illinois law, notice to the obligor (Ten Sleep) is not essential to the validity of an assignment. Stilwell v. American General Life Insurance Co., 555 F. 3d 572, 578 (7th Cir. 2009); Grunloh v. Effingham Equity, Inc., 174 Ill. App. 3d 508, 528 N.E. 2d 1031, 1039 (4th Dist. 1988). As the Seventh Circuit held in Stilwell:

> …Absent a statutory requirement to the contrary, notice to the debtor is not essential to the validity of an assignment, unless the debtor acted to his prejudice because of lack of notice or before receiving notice of the assignment….

None of the exceptions to the general rule apply. For example, lack of notice might apply to an obligor who continued to make payments to the assignor because the obligator had no notice of the assignment. The obligor would be prejudiced if the assignee then sought recovery of amounts the obligor had already paid. In this case, however, Carter and Ten Sleep, knowing that their relationship with RJO was over, cannot easily assert that they were prejudiced because of lack of notice of the assignment

6

of the Account Agreement. Carter's testimony at trial that he barely read the Account Agreement in the first place, did not keep a copy of it, and would have signed a Straits agreement in any event[6] greatly undermines Ten Sleep's contention that it would never have agreed to open a second account if it knew that there was an assignment of the RJO Account Agreement.

Under these circumstances, the general rule that notice of the assignment to the obligor is not required applies.

## IV. THE EVIDENCE ADDUCED AT TRIAL DEMONSTRATES THAT TEN SLEEP AND CARTER KNEW THE ACCOUNT AGREEMENT HAD BEEN ASSIGNED

Straits submits that the evidence adduced at trial convincingly demonstrates that Ten Sleep and Carter knew that the Account Agreement itself had been assigned and would become the documentation for the Straits accounts after the transfer of the account to Straits.

Perkins testified at trial that he told Carter that the RJO paperwork would become the Straits paperwork and that no new account documentation needed to be signed when he informed Carter of his decision to move from RJO to Straits.[7] Perkins' testimony on this point is convincing.[8] Perkins knew that the RJO account agreements, including the Cadent Financial agreements of those of his customers who previously had transferred to RJO, were being assigned to Straits in order for their Straits accounts to be effective.

---

[6] Jaclyn Tholl testified that the Straits account documents contains similar provisions to the RJO Account Agreement.

[7] Oral notice of an assignment is sufficient. Williston on Contracts (4th Ed. 2003) §74.62, note 71.

[8] Whatever other factual issues there may be on other aspects of Perkins' testimony, at the time of the transfer, Ten Sleep only had the "33 account", so that nothing that happened subsequently regarding the "35" account should have any bearing on Perkins' testimony regarding the assignment.

Perkins had gone through a similar transfer only a little more than a year before when he moved from Cadent to RJO. He testified that he told all of his customers the same thing, to make it clear to them that they would not have to sign new account agreements when moving to Straits. No customer other than Ten Sleep has challenged the transfer. This testimony makes logical sense.

Carter's recollection of this conversation is far less convincing. He remembers very little about the conversation with regarding transfer of his account. Given Carter's faulty memory about the March 16, 2012 which is critical in this case, it is not surprising that Carter does not remember his year-earlier conversation with Perkins that his RJO paperwork would become his Straits paperwork. [9]

That Carter and Ten Sleep knew that the RJO account agreement had been transferred to Straits also makes logical sense. Just a year before the assignment to Straits, Carter had received from Perkins and RJO a 30 page Account Application and Agreement to complete in order to open his RJO trading account. As the Account Agreement states, Joint Exhibit 1 at TENS 000250, "a new account can be traded only when the Application and initial funds are accepted in, and the Application is approved by, RJO's Chicago office". A year later, Carter and Ten Sleep were not novices in commodity trading but had committed millions of dollars to trading under the RJO account agreement. Under these circumstances, Carter's testimony that he did not know of or realize that he needed a new account agreement to trade with Straits strains credulity. Rather, the most consistent and logical explanation is that he knew that his

---

[9] This is consistent with Carter's generally poor recollection of other conversations with Perkins. Carter remembers very little about many things, not even remembering that his critical March 16, 2012 conversation with Perkins, which he characterized as one of the most exciting calls of his life, involved two, not one, $300,000 transfers.

Account Agreement had also been assigned so that he did not have to sign new account papers in order to trade his Straits account.

A more cynical explanation is that Carter, knowing that Ten Sleep had not signed a new Account Agreement with Straits, continued on in silence without inquiring as to whether he either needed to sign a new account agreement or use the existing RJO one. His silence allowed him to take advantage of the situation by trading in an account without being obligated to an account agreement and denying liability to Straits when the account went sour.[10]

Fortunately, the law does not permit someone with such knowledge to take advantage of his silence. It is hornbook law that one who has knowledge of facts sufficient to induce a prudent person to inquire with respect to other facts germane to the matter in hand will be charged with knowledge of such other and further facts as he might have learned by reasonable diligence in pursuing his inquiry in the right direction. Williston on Contracts (4th Ed. 2003) §74.62 at note 64. Here, even if Carter can credibly be believed that Perkins did not inform him that the RJO paperwork would apply to Straits, Carter had enough facts on hand, as set forth above, to have required him to inquire whether he had or needed an agreement and whether Straits was using the RJO paperwork. DiPietro v. Boynton, 628 A. 2d 1019, 1023-24 (Me. 1993) (applying Williston principle and finding that the obligor had enough information, even without

---

[10] Assume that Ten Sleep that there were no claims of unauthorized trading, that there was no "35" account, that Ten Sleep had incurred a massive loss in its "33" account, and that Ten Sleep did not have sufficient funds to cover the loss. Ten Sleep would be arguing today that it is not liable for that debit because there was no Straits agreement and that the RJO agreement was not validly assigned. This is an example of the type of cases that may flood the futures industry if a finding is made that notice of the assignment is required to validate an assignment of an account agreement.

actual notice of assignment, to be required to inquire about the existence of the assignment).

It is likely that Carter and Ten Sleep have only recently developed their position that they did not know of the assignment of the Account Agreement. In his Declaration and two briefs relating to his Motion to Dismiss the Complaint against him based on his Guaranty, Carter never averred or argued that he did not know that the Account Agreement had been assigned. [See Docket ##8, 28]. While Carter averred that he never signed an agreement or a guaranty with Straits, an issue that was never disputed, and while he offered myriad other reasons why the Guaranty should not be enforced as to him, he nowhere says that he did not know that the Account Agreement had been assigned. In these circumstances, the most likely conclusion is that this purported lack of knowledge is recently fabricated to squeeze within the recent Illinois case relied upon by Carter to defeat Straits' claim against him. [Infra, Section V].

Ten Sleep's pleadings also support this conclusion. In Count III of its Counterclaim Ten Sleep alleged that Straits had violated the Illinois Consumer Fraud Act by, inter alia, falsely representing that it would conduct trades in accordance with applicable rules of the exchanges, the NFA and the CFTC. When asked at trial who had made that representation, Carter was unable to identify any such representation. The reason is that no individual made that representation; that "representation" is contained verbatim in the Account Agreement [Joint Exhibit 1 at TENS 000259], thereby indicating Ten Sleep's belief and acknowledgment long before trial that the RJO Account Agreement governed its relationship with Straits.[11]

---

[11] The Account Agreement specially provides that any violation of any such rule or regulation shall not be the basis of a claim against RJO. [Joint Exhibit 1 at TENS 000259].

Finally, Carter also offered no explanation why he signed the "Related Account Authorization" referring to "agreements on file with Straits" and "existing account documentation, customer agreements and other agreements" without inquiring as to the meaning of that language if he did not know that the RJO Account Agreement had been assigned to Straits. Rather, Carter's signing this Authorization is consistent with a conclusion that he knew that the Account Agreement had been assigned or transferred to Straits and that that RJO Account Agreement was the operative agreement to which the Authorization referred[12]. Because Carter signed the Authorization for Ten Sleep, Ten Sleep is bound by the terms of that Authorization and, by reference, to the terms of the Account Agreement itself.

### V. CARTER'S GUARANTY

Ten Sleep and Carter rely heavily on the recent Illinois Appellate Court case of Southern Wine and Spirits of Illinois, Inc. v. Steiner, 8 N.E. 3d 1065 (1st Dist. 2014). In that case, the Court invalidated the assignment of a guaranty where the assignee sought to invoke the guaranty years after the assignment without notice to the guarantors. The company whose debts were guaranteed had never done business with the assignor. The company later began doing business with the assignee. When it failed to pay for goods sold, the assignor sued the guarantors under the original guaranty. The Court upheld dismissal of the suit on the guaranty, holding that the failure to provide notice materially increased the risk to the guarantors because they did not know they would be liable for newly incurred debt because they had never done business with the original assignor. 8 N.E. 3d at 1070-71.

---

[12] Perkins again testified that he told Carter that this Authorization meant that a new account agreement did not need to be opened for the new account.

Steiner is inapplicable to this case. First, Steiner involved only the assignment of a guaranty, not the assignment of an agreement or contract. The Court recognized the special nature of guarantees, stating that courts afford the guarantor the benefit of any doubt and strictly construe guaranty agreements in favor of the guarantor. Moreover, the Court noted the general rule that guarantees are not assignable. 8 N.E. 2d at 1069-70. In contrast, as noted above, assignments of general contracts are presumptively valid. For this reason, the holding in Steiner applies, at most, to Carter's Guaranty, not to Ten Sleep's Account Agreement of which the Guaranty is a part.

Second, the Steiner ruling does not impose a general rule that notice of an assignment is a prerequisite to the validity of the assignment. In Steiner, the guarantors had no knowledge of either the transaction between the original company to whom they had issued their guaranty ("Morand") and the company which had acquired their guaranty ("Superior") or of other facts sufficient to impose on them a duty to inquire as to whether an assignment had occurred. Several years later after the acquisition, Superior sought to enforce the guaranty that defendants had given to Morand. The Court ruled that under those facts, the assignment of the guaranty material increased the risks to the guarantors, thereby invalidating the assignment.

The Steiner factual scenario is much different from the facts of this case. Ten Sleep and Carter knew of the transaction by which Straits took over the Ten Sleep RJO account. Moreover, as argued above, they either knew or should have realized that their Account Agreement had been transferred to Straits. For these reasons, the Steiner decision does not govern in this case, and, at most, should be limited to Carter's Guaranty.

12

## VI. PUBLIC POLICY REASONS SUPPORT ASSIGNABILITY WITHOUT REQUIRING NOTICE

Because of the prevalence in the futures industry of assignments of account agreements when there is a bulk transfer of accounts, a ruling that such assignments are invalid unless notice is given to the customer runs the risk of negative consequences to the futures industry and to the courts, including but not limited to the following:

1. Customers like Carter and Ten Sleep could claim that they never received notice of the assignment of their account agreements, just like in this case they claim that they did not receive the RJO notice of the transfer of their accounts. Such a claim would require a factual determination in every case of whether notice was actually received.

2. Customers like Ten Sleep and Carter would get a free "option" in trading their accounts. If their accounts are profitable, they can lay back and collect their profits. If their accounts lose, they can claim they are not liable because their FCM cannot enforce provisions of their assigned Account Agreement. In any event, a flood of litigation will ensue.

3. FCMs will become more cautious in accepting assignments. This will not only hinder the free movement of brokers who seek to transfer their customers to another firm but will also cause delays in customers being able to transfer accounts or open new accounts after transfer so that the new FCM can be convinced that the assignment is valid. If FCMs require new account documentation, costs will increase for both the FCMs and for customers who will have to wait to receive, sign and return their new agreements, wait for compliance personnel to ensure completeness, and then make any further changes that may be required.

13

4. While the costs of notifying any one customer of an assignment might be minimal, given the extensive nature in the FCM community of assigning account agreements, the costs of notice to all customers, of ensuring compliance with such notice, and of repapering account documentation to ensure the validity of documents, are considerably much higher.

On the other hand, upholding an otherwise valid, commonplace assignment agreement like that between RJO and Straits, imposes no costs whatsoever on customers. They would continue to be bound by the very same provisions that they had previously agreed to and which had bound them before the assignment of their accounts. In no way does this increase their risks. Indeed, requiring them to sign a new agreement might actually increase their risks, if the new agreement contains more onerous terms.  At the very least, customers would have to incur the additional costs of reviewing the new account agreement and comparing it to their existing agreement to determine whether they wanted to sign a new agreement.

Given all these and other reasons, Straits urges the Court to hold that, in the circumstances of this case, that the assignment of the Account Agreement from RJO to Straits is valid and binding on Ten Sleep and Carter.

s/Howard J. Stein

Attorney for Straits Financial
LLC

Howard J. Stein
70 W. Madison St.
Suite 2100
Chicago, IL 60602
312.726.4514
hsteinlaw@aol.com
N.D. IL. No. 2116208

## **CERTIFICATE OF SERVICE**

Howard J. Stein, one of the attorneys for Straits Financial LLC, hereby certifies that he served a copy of the foregoing Post-Trial Brief upon all counsel or record by the Court's CM/ECF system this 24th day of September 2014.

s/_____
Howard J. Stein