**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| STRAITS FINANCIAL LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>TEN SLEEP CATTLE CO., and<br>RICHARD CARTER,<br><br>    Defendants.<br><br>    v.<br><br>JASON PERKINS,<br><br>    Third-Party Defendant. | No. 12 C 6110<br>Judge James B. Zagel |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**

This action was tried on the facts without a jury. Pursuant to Rule 52(a)(1), the Court's findings of fact and law are stated below.

*FINDINGS OF FACT*

1. Plaintiff Straits Financial LLC ("Straits") is an Illinois-based registered futures commission merchant.

2. Defendant Ten Sleep Cattle Co. ("Ten Sleep") is a Wyoming-based cattle ranch.

3. Defendant Richard Carter ("Carter") was the owner and president of Ten Sleep at all relevant times during this case.

4. Third-Party Defendant Jason Perkins ("Perkins") was a broker for futures commission merchant R.J. O'Brien ("RJO") and later an employee, associated person, and branch manager for Straits.

5. Carter has a high school education and, at the time of his dealings with Perkins, had no

1

experience trading futures contracts or securities of any kind.

6. In March 2010, Ten Sleep opened a hedge account ("the 33 Account") with RJO and its broker at the time, Perkins. The account was created to hedge cattle.

7. Carter executed an Account Agreement with RJO authorizing Perkins to engage in transactions and including a personal guaranty that required Carter to assume any debts owed by Ten Sleep to RJO.

8. The Account Agreement stated, in part: "This Agreement shall be binding upon Customer's personal representatives and legal successors, and shall inure to the benefit of RJO's successors by merger, assignment, consolidation or otherwise . . . Any rights that Customer may have pursuant to this Agreement shall not be assigned, transferred, sold or otherwise conveyed by Customer to another party. Under certain circumstances, RJO may, subject to exchange, National Futures Association ("NFA") or Commodity Futures Trading Commission ("CFTC") rules, assign this account to another duly registered Futures Commission Merchant ("FCM")."

9. In April 2011, Perkins left RJO and moved his customers and their accounts to Straits. Perkins testified at trial that he told Carter the RJO paperwork would become the Straits paperwork, and no additional documentation needed to be signed. He also said it was his practice to send a letter informing his clients that their account would be transferred unless a client raised an objection. Although there was no specific evidence that this kind of communication was made with Carter, I find Perkins' testimony credible on this point, in part because there is no evidence that conflicts with his testimony, nor is there evidence that Perkins failed to notify his other customers of this procedure.

10. Ten Sleep never signed an account agreement with Straits directly. Perkins and Straits

claim that Ten Sleep's RJO Agreement was assigned to Straits but Carter disputes this. Carter testified that he barely read the RJO account agreement and didn't keep a copy of it, and further argues that the account agreement itself is not assignable even if the account is. I find his testimony credible as to his ignorance of the alleged assignment. Carter has a high school education, was an inexperienced and naïve trader, and was never informed in any straight-forward or transparent way that Straits and Perkins considered Carter to be bound by the agreement with RJO.

11. Shortly after the move to Straits, Perkins suggested and Carter agreed to open another account for speculative trading (the "35 Account"), from which they would split the profits. Perkins did not notify Carter that it was against Straits policy for Perkins to share in a customer's account profits.

12. Carter testified that he initially expressed reluctance to engage in speculative futures trading but that Perkins allayed Carter's concerns by promising there would be no margin calls in the 35 Account. In Perkins' words, he would only "nibble around the edges," rather than speculate large sums.

13. Carter orally agreed to grant Perkins discretion to trade the 35 Account without Carter's prior authorization. Perkins failed to inform Carter that Perkins could not legally take discretion in the account without Carter's written authorization.

14. Straits opened the 35 Account around June 1, 2011. Instead of executing a new account agreement and guaranty, Straits had Carter sign a Related Account Authorization that incorporated by reference "existing account documentation including but not limited to agreements … maintained and existing on file with Straits." While Straits contends this incorporated the RJO agreement, the Related Account Authorization made no specific

mention of that or any other prior agreement. Carter testified at trial that he did not understand when signing the Related Account Authorization that he was agreeing to be bound by the RJO account agreement, and I found this assertion to be credible.

15. I agree with Ten Sleep's argument that Straits simply needed to name or sufficiently describe the RJO Agreement in order to clarify its intent to bind Carter under that agreement, and that their failure to do so rendered the supposed "incorporation by reference" so opaque as to be unenforceable. Moreover, since Straits is the party who stood to benefit from clarifying the terms and validity of the assignment, it was Straits' burden to do so in a clear, unambiguous way. This is not an unusual or difficult task. A few simple sentences would have sufficed to communicate everything Straits needed Carter to know. Instead, Straits relied on inferences they drew from Carter's silence or lack of objections, which cannot on their own render the RJO agreement binding.

16. On or about March 16, 2012, Perkins told Carter he had generated a $300,000 profit in the 35 Account. Carter testified that he then ordered Perkins to stop trading and send him a check for the $300,000, and that Perkins agreed. I find Carter's testimony credible on this matter. It is clear to me from his testimony that he intended all along to make a profit and then close out the account.

17. Perkins continued trading in the 35 Account without telling Carter, resuming trading activities as early as the day after the phone call with Carter.

18. By about June 2012, Perkins had accumulated over $2,000,000 in losses in the 35 Account. He revealed these losses to Carter in a phone conversation that month.

19. Straits and Perkins claim that all the trades, including those made after Carter instructed Perkins to close the account, were promptly reported and mailed to Carter. Carter claims

that he spent these months away from his home herding cattle in the fields, and thus didn't see any of these records as he was not reachable while herding. I find it credible that Carter's work took him into remote areas for weeks at a time, but I also find that Carter is partially responsible for failing to make arrangements in case anyone needed to contact him, especially when he was involved in financial dealings that required his oversight and approval.

20. After the losses came to light, Straits made a demand for Ten Sleep to pay the debit balance. Ten Sleep refused.

21. On or around June 20, 2012, without Ten Sleep's knowledge or consent, Straits confiscated all the assets in the Hedge Account to cover the deficit balance in the 35 Account. Nevertheless, Straits was left with a shortfall of $168,877.02.

22. Carter and Perkins met at Carter's lawyer's office on June 25, 2012. At the meeting, Perkins signed an affidavit admitting that he had continued to trade the 35 Account without Carter's knowledge or permission. At trial, Perkins contested the accuracy of his affidavit. I find that his testimony on this point was not credible and I am giving weight to the admissions in the affidavit.

23. Straits seeks to recover the $168,877.02 debt left over from Ten Sleep's combined accounts, as well as interest, costs, and attorney's fees. Ten Sleep, meanwhile, seeks to recoup its $2 million in trading losses from Strait as the principal for Perkins.

24. My conclusions based on the complete trial testimony, including his words, the manner of their utterance, and his general demeanor, is that Carter's evidence is reliable.

## CONCLUSIONS OF LAW

1. Perkins' actions do constitute fraud under the Commodities Exchange Act because he

knowingly and intentionally made unauthorized trades, even if his intent was not malicious. *Prestwick Capital Management Ltd. v. Peregrine Fin. Group Inc.*, No. 10 C 23, 2010 WL 4684038 at *3 (N.D. Ill. Nov. 1, 2010) (citing § 4b of the Commodities Exchange Act, 7 U.S.C. § 6b); *Moll v. Heingold Commodities, Inc.*, 1989 WL 58205 at *2-3 (N.D. Ill. 1989); *Cange v. Stotler & Co., Inc.*, 826 F.2d 581, 589 (7th Cir. 1987).

2. Straits is vicariously liable for the Commodities Exchange Act violations that their agent, Perkins, committed while acting within the scope of his employment with Straits. *See* Commodities Exchange Act; *Stotler and Co. v. Commodity Futures Trading Com'n*, 855 F.2d 1288, 1292-93 (7th Cir. 1988); *Rosenthal & Co. v. Comm. Futures Trading Com'n*, 802 F.2d 963, 966 (7th Cir. 1986); 7 U.S.C. § 2(a)(1)(b). Perkins' unauthorized trading of the Ten Sleep accounts did occur within the scope of his employment with Straits.

3. Perkins breached his fiduciary duty to Ten Sleep by continuing to trade with Ten Sleep's funds even after Carter instructed him to stop, and by failing to disclose this activity to Carter. *See Prestwick Capital*, 2010 WL 4684038 at *5; *McBlaine v. Jack Carl Associates, Inc.*, 705 F.Supp. 1340, 1343 (N.D. Ill. 1989); *Anspacher & Assocs., Inc. v. Henderson*, 854 F.2d 942, 945 (7th Cir. 1988); *Evanston Bank v. Conticommodity Services, Inc.*, 623 F. Supp 1014, 1023-24 (N.D. Ill. 1985).

4. Although Ten Sleep is a non-Illinois resident, it may be entitled to bring a cause of action under the Illinois Consumer Fraud Act (ICFA) when the transaction at issue occurred "primarily and substantially in Illinois." *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 396-97 (7th Cir. 2009) (quoting *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 186-87 (Ill. 2005)); *The Clearing Corporation v. Financial Energy Exchange Limited*, 2010 WL 2836717 (N.D. Ill. 2010). This requires something more than the fact of

Straits' being headquartered in Illinois. *Avery*, 216 Ill. 2d at 189. While *Avery* ultimately throws out an ICFA claim by non-Illinois residents, the Illinois Supreme Court notes that for those plaintiffs, "the damage to their vehicles did not occur in Illinois, they did not receive their repair estimates in Illinois, and they did not have their cars repaired in Illinois." *Id*. at 190. By contrast, both Straits and RJO are located in Illinois (and thus could expect to be subject to ICFA) and Carter knowingly had protracted dealings with both. Moreover, *Avery* and the Seventh Circuit opinion in *Crichton* both consider facts like where payments for services were sent, the location of the contracts, where any complaints about the performance of the contract were to be directed, and where the deceptive statements were made, each of which strengthens Ten Sleep's ties to Illinois in this case. However, there is no bright line test on the facts here and there is a clear split in authority in this district as to how liberally to construe the statute. *Clearing Corp.*, 2010 WL 2836717 at *6. I find, following the more liberal construction of the statute, that the transactions at issue did occur "primarily and substantially in Illinois." Although it is difficult to ascribe a location to conversations that took place over the phone or mail, Illinois can rightfully be considered the site of the transactions because of the factors listed above and the fact that the wrongful acts occurred here, both Straits and Perkins were located here, and at least one major player was in Illinois when most communications between the parties took place. Thus, I find that Ten Sleep is entitled to bring an ICFA claim in this case.

5. To state an ICFA claim, Ten Sleep must show that 1) Straits engaged in a deceptive act or practice; 2) Straits intended that Ten Sleep rely on the deception; and 3) "the deception occurred in the course of conduct involving trade or commerce." *MAN Roland Inc. v. Quantum*, 57 F.Supp.2d 568, 574 (N.D. Ill. 1999) (quoting *Adler v. Williams Blair & Co.*,271

Ill.App.3d 117, 207 Ill.Dec. 770, 648 N.E.2d 226, 233 (1995)). As discussed in the facts above, Ten Sleep adequately demonstrated each of these elements. Straits is liable for violating ICFA.

6. Straits and Perkins have been unjustly enriched by the commissions on Perkins' unauthorized trading as well as the money that Straits confiscated from the Hedge Account to cover the losses incurred by Perkins in the 35 Account. *Gondeck v. A Clear Title & Escrow Exchange, LLC,* 2012 WL 5200091, *6 (N.D. Ill. Oct. 22, 2012) (requiring that "[t]o state an unjust enrichment claim, a plaintiff must allege 'that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience.'" (quoting *HPI Health Care Serv., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145 (Ill. 1989).). *See also Peddinghaus v. Peddinghaus,* 314 Ill.App.3d 900 (Ill.App. 2000) (stating that "fraud, if proved, also constitutes unjust enrichment.").

7. Under Illinois common law, conversion is an unauthorized and wrongful deprivation of an owner's right to his property. *G.M. Sign, Inc. v. Elm Street Chiropractic, Ltd.*, 871 F.Supp.2d 763, 767 (N.D. Ill. 2012). A right to money does not ordinarily support a conversion claim unless the money at issue can be described as "specific chattel," the plaintiff's right to the money is absolute, and the money claimed (or its equivalent) "*at all times* belonged to the plaintiff and that the defendant converted it to his own use." *Horbach v. Kaczmarek*, 288 F.3d 969, 978 (7th Cir. 2002) (quoting *In re Thebus*, 108 Ill.2d 255, 91 Ill.Dec. 623, 483 N.E.2d 1258, 1260 (1985)). Here, Ten Sleep's funds and investments belonged to it at all times and were segregated in their own accounts so as to be easily identifiable as "specific chattel." Because Straits' confiscation of the funds to cover Perkins'

losses permanently deprived Ten Sleep of its right to the money, Straits is liable for conversion.

8. The RJO agreement did bind Ten Sleep after the account was assigned to Straits. Restatement (Second) of the Law of Contracts § 317(2) (stating that a contract is assignable unless "the assignment materially changes the duties of the obligor, increases the obligor's risk, impairs the obligor's chance of obtaining return performance, materially reduces the value of the contract to the obligor, is forbidden by statute or public policy, or is validly precluded by the contract," all circumstances which were not present here.) However, Straits' failure to communicate that the agreement was assigned, even by an act as simple as mentioning the RJO agreement by name in Straits' Related Account Authorization, invalidates whatever assignment may have otherwise taken place.

9. The general rule in Illinois is that "a guarantor is not liable for anything which he did not agree to and if the creditor and principal have entered into an agreement materially different from that contemplated by the instrument of guaranty, the guarantor shall be released." *Grundstad v. Ritt*, 166 F.3d 867, 870 (7th Cir. 1999) (quoting *Bernardi Brothers v. Great Lakes Distributing*, 712 F.2d 1205, 1207 (7th Cir. 1983)). Illinois courts look to "whether there has been a material change in risk to the guarantor." *Grundstad*, 166 F.3d at 870. Here, the investment agreement at Straits meaningfully altered the scope of Ten Sleep's investments and the risk level involved. But even were that not the case, the guaranty, like the RJO Agreement, was not properly assigned. As discussed above, Straits failed to clearly and specifically communicate to Ten Sleep which agreements and contracts were being assigned, invalidating the attempted assignment. Thus the guaranty Carter signed when working with RJO did not continue to bind him in his dealings with Straits, and Straits' claim

9

for breach of guaranty cannot be enforced.

10. A party cannot recover for damages they could have prevented through reasonable diligence and ordinary care. *See, e.g., Ner Tamid Congregation of North Town v. Krivoruchko*, 638 F.Supp.2d 913, 919-20 (N.D. Ill. 2009). Here, Ten Sleep did fail to mitigate damages by neglecting communications for up to a month at a time and never inquiring about suspicious circumstances that should have given Carter and Ten Sleep pause. For instance, Carter believed he was not bound by the RJO Account agreement but seemingly did not know what document did govern his relationship with Straits. Yet he never raised this issue with either Perkins or Straits. Carter's damages must be accordingly reduced by the proportion of responsibility he bears.

11. Straits' actions do not incur punitive damages because there is no evidence of "extraordinary or exceptional circumstances clearly showing malice and willfulness" with regard to Ten Sleep's rights. *Medcom Holding Co. v. Baxter Travenol Laboratories, Inc*, 106 F.3d 1388, 1402 (7th Cir. 1997) (noting that Illinois courts rarely impose punitive damages, and when they do, they require something more than bad faith or simple fraud).

IT IS THEREFORE ORDERED that:

1. Straits is liable for compensating Carter for reasonable costs, attorneys' fees, and the losses incurred by Perkins' unauthorized trading.

2. Because an unknown proportion of the loss was due to Carter's negligent failure to communicate with or remain accessible to Perkins, a hearing will be held to examine Carter's contribution to the losses. After the hearing, the Court will determine how much to reduce Carter's damages. Alternatively, the parties may confer among themselves and present the Court with a suggested amount for compensatory damages.

3. No punitive damages are awarded against Straits.

                              ENTER:

                              James B. Zagel
                              United States District Judge

DATE: December 16, 2015