UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STRAITS FINANCIAL LLC, <br><br> Plaintiff, <br><br> v. <br><br> TEN SLEEP CATTLE CO., and RICHARD CARTER, <br><br> Defendants. <br><br> TEN SLEEP CATTLE CO., <br><br> Counter-Plaintiff and Third-Party Plaintiff, <br><br> v. <br><br> STRAITS FINANCIAL LLC, <br><br> Counter-Defendant <br><br> and <br><br> JASON PERKINS, <br><br> Third-Party Defendant. | Case No. 1:12-cv-06110 <br><br> Honorable James B. Zagel |

**TEN SLEEP CATTLE CO.'S AND RICHARD CARTER'S POST-TRIAL BRIEF ON MITIGATION OF DAMAGES**

In three quick months, Straits Financial LLC's employee Jason Perkins racked up over $2.2 million in unauthorized trading losses in Ten Sleep's 35

Account at Straits. Straits failed to detect Perkins' unlawful activities because it ignored numerous red flags that should have spurred further investigation:

- 🚩 The 35 Account was ostensibly set up as a hedge account to trade cattle futures and related commodities, yet the account traded almost exclusively in U.S. Treasury bond futures in which Perkins amassed a huge position;

- 🚩 The 35 Account was severely under-margined and there was a large volume of margin calls;

- 🚩 There was a huge jump in commissions in late May 2012 and the trading activity was well outside the normal range for Ten Sleep's accounts; and

- 🚩 Ten Sleep seemed to be a non-responsive client, according to the email exchanges between Perkins and Straits' risk manager.

As to that last point, Perkins flat-out lied, as he did so often in this case—which Straits could have easily discovered if they had made any attempt to investigate by doing something as simple as calling Carter directly. While it is true that Carter was working during much of this time down in Manderson, WY (some 40 miles from his home in Ten Sleep) or in Rawlins (some 4 hours away), Carter was *always* reachable on his cell phone. There was not a single day during the unauthorized trading period that Perkins was unable to reach Carter the same day he tried. Carter had no reason to know that Perkins had disregarded his instructions to stop trading in that account and "shut it down."

Straits, on the other hand, had ample opportunity to figure out what Perkins was up to, but chose to ignore obvious signs of questionable activity. As a registered futures commission merchant, Straits must implement policies and procedures to ensure that its employees comply with the laws, rules and regulations that govern

2

the commodities industry, including systems designed to detect and prevent unauthorized trading. According to Michael Weiner's unrebutted expert testimony, Straits failed dismally in that regard.

Perkins' spree ended when Straits decided to liquidate the positions in Ten Sleep's 33 Account and confiscate the proceeds to cover the deficit in the 35 Account. At that point, Perkins was forced to confess to Carter what he had done. By the time Carter found out that Perkins had continued trading the 35 Account without authorization, all of the damage was done.

The Court has found that the actions of Straits' employee, Jason Perkins, constitute fraud under the Commodities Exchange Act, and that Straits is vicariously liable for that fraud. The Court has also found Straits and Perkins liable for breach of fiduciary duty, violation of the Illinois Consumer Fraud Act, unjust enrichment and conversion. The question to be addressed now is what, if any, part of the losses should be attributed to Ten Sleep for Carter's alleged failure to mitigate damages. Ten Sleep respectfully suggests the answer is ***none***.

Trying to determine the point at which Carter should have known his broker was defrauding him is a question of comparative fault—which does not apply to intentional torts like fraud. The duty to mitigate damages, on the other hand, only arises once the victim becomes aware of the damage. *Ner Tamid Congregation of North Town v. Krivoruchko,* 638 F. Supp. 2d 913, 921 (N.D. Ill. 2009). Here, it is beyond dispute that Carter was unaware of the losses Perkins caused through his unauthorized trading until on or after June 20, 2012, when Perkins was forced to

3

confess the scheme to him. At that point, there was nothing Carter could do to mitigate Ten Sleep's damages.

## FACTUAL BACKGROUND

In March 2010, Ten Sleep opened a hedge account (the "33 Account") with futures commission merchant R.J. O'Brien ("RJO") and its guaranteed introducing broker, Jason Perkins. (Dkt. #83, Findings of Fact ("Findings") ¶ 6.) Ten Sleep's president, Richard Carter, is a rancher with a high school education. Prior to this case Carter had no experience trading futures contracts or securities of any kind. *Id.* ¶ 5. The account was created to hedge cattle. *Id.* ¶ 6.

In April 2011, Perkins left R.J. O'Brien and moved his customers and their accounts to Straits, where he became an employee, associated person and branch manager. *Id.* ¶ 9. Perkins did not have Ten Sleep sign a new account agreement and did not notify Ten Sleep that the RJO agreement had been assigned. *Id.* ¶¶ 10.[1]

Shortly after Perkins moved to Straits, he convinced Carter to open another account for the purpose of speculative trading (the "35 Account"). *Id.* ¶ 11. Perkins proposed, and Carter orally agreed, that Perkins would have discretion to trade the 35 Account without contacting Carter for prior authorization, and that they would split the profits from the speculative trading. *Id.* ¶¶ 11, 13. Unbeknownst to Carter, Perkins' proposal violated industry rules and regulations, as well as Straits' written policies. *Id.* Although Carter was initially reluctant, he ultimately agreed to

---

[1] The facts and circumstances surrounding Perkins' transfer to Straits and the consequences of Straits' failure to have Ten Sleep and Carter execute a new account agreement, or notify Ten Sleep and Carter that it intended to enforce the RJO agreement, were previously briefed in Ten Sleep's Trial Brief (Dkt. # 64) and Post-Trial Brief on Assignment Issues (Dkt. # 81).

4

Perkins' proposal, based in large part on Perkins' promise that he would "nibble around the edges" and that there would be no margin calls in the 35 Account. *Id.* ¶ 12. The account paperwork Perkins completed indicated that the 35 Account was supposed to be a hedge account, for trading cattle, feeder cattle and corn futures. Joint Ex. 6, STRAITS 000523. From the beginning, Perkins traded U.S. Treasury bond futures almost exclusively. Joint Exs. 14 – 17.

On or about March 16, 2012, Perkins informed Carter that he had generated $300,000 in trading profits in the 35 Account. *Id.* ¶ 16. Carter instructed Perkins to stop trading, send a check for $300,000 and close out the account. *Id.*[2] However, as soon as the very next business day, Perkins resumed trading in the 35 Account without telling Carter or getting his authorization. *Id.* ¶ 17.

Perkins was able to hide his unauthorized trading from Carter because, unbeknownst to Carter, Straits was cross-margining the 33 Account with the 35 Account. As such, whenever there was a margin call in the 35 Account, Perkins would simply lie to Carter and tell him he needed to wire money to cover margin in the 33 Account.[3] Carter sent money each time Perkins told him to do so, on the very same day he and Perkins spoke.[4] All of the wire transfers (except for one[5]) were

---

[2] As previously agreed, Carter then sent Perkins a check for $150,000. Joint Ex. 10.

[3] Carter testified that he wasn't particularly concerned about fluctuations in the value of the 33 Account because the purpose of the 33 Account was to mitigate the risk of having so much capital tied up in his herd. If the 33 Account was down, it meant the value of his inventory was up.

[4] Ten Sleep Exs. 19 & 20.

[5] The only deposit to the 35 Account was on April 20, 2012. Joint Ex. 14 at STRAITS 00068; Joint Ex. 21 at STRAITS 000778. The wire was originally set up for deposit to the 33 Account, but someone at STRAITS manually changed the account number to the 35 Account. Joint Ex. 21 at 000778. No explanation has ever been given for this change, but according to the phone records and

deposited into the 33 Account. Joint Ex. 17 at STRAITS 000118, 000121, 000124, 000127, 000130; Joint Ex. 20.

During this time, Carter was often working in remote areas away from Ten Sleep because it was calving season. Findings ¶ 19. From time to time, that meant Carter would not immediately answer and Perkins would leave a message on his cell phone. Carter was diligent, however, about returning Perkins' calls. Indeed, Carter always called back and spoke to Perkins on the very same day. Joint Ex. 23 & 24; Ten Sleep Ex. 19 (a copy of Ten Sleep Ex. 19 is attached as Exhibit A).[6] Carter, having no idea that Perkins was still trading in the 35 Account, had no reason to be calling Perkins, other than perhaps occasionally to check cattle prices.

By early May 2012, Straits' risk manager, Mike Malecki, was sounding the alarm about Ten Sleep's accounts. *See, e.g.*, Joint Ex. 26, STRAITS 000448 – 000449, 000460, 000461. Yet neither he nor anyone else at Straits did anything to investigate Perkins' activities and possibly intervene.[7] Meanwhile, Perkins began to trade even more frequently and recklessly, generating $49,000 in commissions in May 2012 alone. Joint Ex. 22, STRAITS 000539.

By May 30, Malecki's anxiety was palpable. Perkins tried to reassure him by saying "He [Carter] is supposed to be calling me back." Malecki's response said it

---

Perkins' testimony, he was in Straits' office in Chicago on that date. Joint Ex. 24 at JP201304-000139 – 000140.

[6] Perkins and Carter each testified about one occasion (May 4, 2012), where Perkins initially had difficulty reaching Carter, so Perkins called Carter's son as well as Alan Barnett at Farm Credit Bank, hoping to track Carter down. Perkins was able to reach Carter no later than 12:32 p.m., and Carter arranged to have $370,000 wired to Straits to cover a margin call that same day. Ten Sleep Exs. 19 & 20.

[7] Ten Sleep's expert, Michael Weiner, also testified that Perkins had a number of under-margined accounts, yet another red flag that Straits could and should have heeded.

all: "Oh man." Joint Ex. 26, STRAITS 000466. Yet the situation was even worse than Malecki thought, because Perkins had lied about trying to call Carter. Perkins had not called Carter since May 23, when he told Carter he needed to deposit $63,000 to meet a margin call, which Carter did. Perkins would not speak to Carter again until June 19—and that was because Carter called him. Ten Sleep Ex. 19.[8]

By June 19, Perkins had accumulated over $2,000,000 in losses in the 35 Account. *Id.* ¶ 18. On that date, without Ten Sleep's knowledge or consent, Straits liquidated all the assets in the Hedge Account—$1,823,167.77—and confiscated the proceeds to cover the deficit balance in the 35 Account, leaving a shortfall of $168,877.02. Joint Ex. 15, STRAITS 000133 – 000137.[9] Perkins did not reveal the losses to Carter until sometime between June 19 and 22. Ten Sleep Ex. 19 (phone records summary). Ten Sleep's total losses are $2,290,532, representing the value of the 35 account as of March 16, 2012 (the date Carter told Perkins to stop trading) and the liquidation value of the 33 Account as of June 19, 2012. Joint Ex. 16 at STRAITS 000153 & Joint Ex. 17 at TENS 000056.

Upon learning what Perkins had done, Carter immediately demanded a meeting with him in Casper, Wyoming. The meeting took place at Carter's lawyer's office on June 25, 2012. Findings ¶ 22. During the meeting, Perkins admitted that he had continued to trade the 35 Account without Carter's knowledge or permission,

---

[8] According to Carter's testimony, he called Perkins on that date to instruct him to liquidate the positions in the 33 Account and wire the proceeds. When Perkins failed to do so, Carter called him back and Perkins eventually confessed to what happened. Ten Sleep Ex. 19.

[9] The Court's findings indicate that Straits confiscated the assets in the 33 Account on June 20, 2012 (Findings ¶ 21), but Straits' statements show that the liquidation happened on June 19. Joint Ex. 15, STRAITS 000133 – 000137.

7

and he signed an affidavit attesting to what he had done. *Id.*; Ten Sleep Ex. 8. The Court gave weight to the admissions in Perkins' affidavit and found Perkins' testimony contesting the affidavit not credible. Findings ¶ 22. In contrast, the Court found Carter's evidence to be credible, stating:

> My conclusions based on the complete trial testimony including his words, the manner of their utterance, and his general demeanor, is that Carter's evidence is reliable.

Findings ¶ 24.

## ARGUMENT

The Court found Straits and Perkins liable for fraud under the Commodities Exchange Act and the Illinois Consumer Fraud Act, as well as for breach of fiduciary duty, conversion and unjust enrichment. Dkt. #83, Conclusions of Law ("Conclusions") ¶¶ 1-7. None of these claims sound in negligence. Hence, the concept of comparative negligence does not apply, and it would not be appropriate to reduce Ten Sleep's and Carter's damages based on the degree to which they may be partially responsible for causing or contributing to the losses. *Casio Computer Co., Ltd. v. Noren,* 35 Fed. Appx. 247, 251 (2002) (citing *Kerrigan v. Am. Orthodontics Corp.,* 960 F.2d 43, 45 (7th Cir. 1992)) ("as a rule the victim's contributory negligence is no defense to intentional torts"). Similarly, the defense of failure to exercise due care or diligence is not available in an intentional fraud case. *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1040 (7th Cir. 1977) (citing *Holdsworth v. Strong,* 545 F.2d 687 (10th Cir. 1976) (en banc)).

The duty to mitigate, on the other hand, is an affirmative defense that applies where "(1) plaintiff failed to exercise reasonable care to mitigate its damages, and (2) plaintiff's failure to exercise reasonable care caused it '**to suffer an identifiable item of harm not attributable to the defendant's negligent conduct**.'" *Nat'l Council on Compensation Ins., Inc. v. American Intern. Group, Inc.*, Case No. 07 C 2898, 2009 WL 466802 at *8 (N.D. Ill Feb. 23, 2009) (emphasis supplied). "Failure to mitigate is not a defense to liability; it concerns only the amount of recoverable damages, not the right to recover damages." *Ner Tamid Congregation of North Town v. Krivoruchko,* 638 F. Supp. 2d 913, 919 (N.D. Ill. 2009). The burden of proving the affirmative defense of mitigation in this case is on Straits. *Id.*; *Nat'l Council on Compensation Ins., Inc.*, 2009 WL 466802 at *8. Here, Straits cannot meet its burden of proof, because **all of the harm** Ten Sleep suffered is attributable to Straits' and Perkins' conduct.

Importantly, a duty to mitigate damages does not arise until the plaintiff becomes aware of the wrongdoing. *Ner Tamid Congregation,* 638 F. Supp. 2d at 921 (N.D. Ill. 2009); *Travis v. Schrimmer*, Case No. 82 C 3870, 1986 WL 4164 at *2 (N.D. Ill. March 17, 1986) (damages are measured as of the date of discovery of the fraud). In *Travis*, the court held that failure to mitigate cannot stand as a defense to a violation of the securities law, explaining:

> Logically, this [failure to mitigate] defense cannot be applied to a securities fraud case where damages are measured as of the date of discovery of the fraud. Damages resulting from plaintiffs' failure to cut their losses after discovery the fraud are simply not recoverable; and, plaintiffs cannot be expected to mitigate damages before they learn that they are the victims of fraud.

9

*Travis*, 1986 WL 4164 at *2.

Here, Carter first learned of Perkin's unauthorized trading spree sometime between June 20 and June 22, 2012, when Perkins was forced to confess to Carter that Straits had liquidated the 33 Account to cover almost $2 million in unauthorized trading losses in the 35 Account. Until that moment, Carter believed Perkins had stopped trading in the 35 Account three months earlier. Upon learning of his losses, Carter immediately demanded a meeting with Perkins, and Perkins signed an affidavit admitting to the unauthorized trading. Of course, by then, all of the damage had been done. The Court found Carter's testimony credible and Perkins' testimony incredible. Findings ¶¶ 16, 22, 24.

Straits cannot point to anything in the record that Carter could have done to lessen his damages once he learned of his $2 million loss. All Straits can do is argue that Carter could have prevented some of his damages if he had looked at his account statements sometime before June 19. If Carter had done so, the argument goes, he would have been alerted to what Perkins was doing and could have put a halt to any further losses by complaining to Straits. But that defense is not failure to mitigate; it is comparative negligence, which does not apply in this case.[10] *Sundstrand Corp.*, 553 F.2d at 1040.

---

[10] By the same token, Carter's failure to complain does not support a defense of ratification, because silence alone is not enough to establish that a customer ratified unauthorized trades. *E.g., Evanston Bank v. Conticommodity Serv., Inc.*, 623 F. Supp. 1014, 1034 (N.D. Ill 1985); *Fey v. Walston,* 493 F.2d 1036, 1050 (7th Cir. 1974) ("Mere failure to read statements and confirmations, or to object to actions revealed therein, could not be deemed sufficient as a matter of law to establish waiver or to raise an estoppel in view of plaintiff's theory of fiduciary relationship."); *Mary Adams v. Black Diamond Futures Trading Inc.*, CFTC Dkt. No. 04-R052, 2007 WL 1110753 at *3 (CFTC Apr. 11, 2007) (internal quotations omitted) ("A customer ratifies unauthorized trading for his account only where it is clear from all the circumstances presented that the intent of the customer was to

For that same reason, Carter should not be held partially responsible for his losses "for failing to make arrangements in case anyone needed to contact him, especially when he was involved in financial dealings that required his oversight and approval." *See* Findings ¶ 19. Even if that were true, which it is not, the best that can be said is that Carter was comparatively negligent to some degree, which is of course irrelevant. *Sunstrand Corp.*, 553 F.2d at 1040. But the phone records in this case absolutely refute the notion that Carter was unavailable to Perkins. The only account Carter thought he needed to be available for was the 33 Account, a non-discretionary hedge account. The two spoke at least 17 times between March 19 and June 22, 2012. Ten Sleep Ex. 19. Carter was always reachable and responded on the very same day whenever Perkins attempted to call him. *Id.* Every time Perkins called about a margin call, Carter sent in money the same day. Ten Sleep Exs. 19 & 20.

Moreover, if Carter could have somehow been "more available" to Perkins, it would have made no difference because Perkins was intentionally trading behind Carter's back. Certainly if Perkins had wanted Carter to know about the unauthorized trading or the losses, he could have told him during one of the 17 phone calls they had during this three-month period. But that is not what fraudsters do.

---

adopt, as his own and for all time, the trades executed for his account without authorization….The customer's adoption of such trading must be clear and unequivocal."). Carter and Ten Sleep have previously briefed this issue in their Trial Brief Post-Hearing Brief on Assignment Issues and incorporate those arguments by reference. (*See* Dkt. # 64 & 81.)

11

As for the "suspicious circumstances … that should have given Carter and Ten Sleep pause" concerning the lack of a written contract with Straits (Conclusions ¶ 10), this argument amounts to a "hypercritical examination" of Carter's conduct. *See Ner Tamid Congregation*, 638 F. Supp. 2d at 922 (failure to mitigate defense is not a basis for "hypercritical examination" of a plaintiff's conduct). Again, the argument is really tantamount to a comparative negligence defense—how Carter contributed to the losses—and not mitigation of damages—what Carter did or failed to do once he learned of the losses.

Nothing in the record points to any fact or circumstance that should have aroused Carter's suspicions when it mattered. Certainly Carter had no reason to ask what contract governed his relationship with Straits after March 16, 2012, when he told Perkins to stop trading and shut down the 35 account. Determining when it should have dawned on Carter to ask Straits what agreement governed their relationship or the 35 Account is an exercise in pure speculation, and insufficient to sustain Straits' burden of proof on mitigation of damages.

## CONCLUSION

For all the foregoing reasons, Straits and its former employee, Jason Perkins, should bear one hundred percent of the responsibility for Ten Sleep's losses from Perkins' unauthorized trading. Ten Sleep and Carter respectfully request judgment in their favor in the amount of $2,290,532, plus pre-judgment interest in accordance with Ten Sleep's Request for Pre-Judgment Interest filed contemporaneously herewith, and attorneys' fees to be determined at a later date.

Dated: February 29, 2016                              Respectfully submitted,


                                                     /s/ Nancy L. Hendrickson
                                                     One of the attorneys for Ten Sleep
                                                     Cattle Co. and Richard Carter


Nancy L. Hendrickson
ARDC No. 6207710
HENDRICKSON LAW FIRM
203 N. LaSalle Street, Suite 1620
Chicago, IL 60601
(312) 332-0855
nancy@hendricksonlawfirm.com

## CERTIFICATE OF SERVICE

Nancy L. Hendrickson, an attorney, hereby certifies that on February 29, 2016, she caused a copy of ***Ten Sleep Cattle Company's and Richard Carter's Post-Trial Brief on Mitigation of Damages*** to be served via the Court's ECF/electronic mailing system upon:

Howard J. Stein
Attorney at Law
70 West Madison Street
Suite 2100
Chicago, IL 60602
hsteinlaw@aol.com


James McGurk
10 South LaSalle Street
Suite 3300
Chicago, IL 60603
jamcgurk@flash.net


                                                      /s/ Nancy L. Hendrickson

# Exhibit – A

*Straits Financial LLC v. Ten Sleep Cattle Co.*
*No. 1:12-cv-06110*

Ten Sleep Summary Exhibit B

## PHONE CALLS BETWEEN PERKINS & CARTER

| DATE | TIME | CALL FROM | CALL TO | LENGTH (minutes) | SOURCE |
|---|---|---|---|---|---|
| 3/2/2012 | 9:19 am | Carter cell Worland, WY | Perkins office Mitchell, NE | 7 | TENS 000322 |
| 3/7/2012 | 11:49 am | Carter cell Worland, WY | Perkins office Mitchell, NE | 5 | TENS 000324 |
| 3/14/2012 | 12:05 pm | Perkins cell Scottsbluff, NE | Carter cell Worland, WY | 2 | TENS 000326; JP20130404-000126 |
| 3/16/2012 | 7:53 am | Perkins cell Scottsbluff, NE | Carter cell Worland, WY | 5 | TENS 000327; JP20130404-0 0126 |
| 3/19/2012 | 8:14 am | Perkins cell Scottsbluff, WY | Carter Cell Greybull, WY | 6 | TENS 000328; JP20120404-0 0127 |
| 3/20/2012 | 12:33 pm | Carter cell Worland, WY | Perkins office Mitchell, NE | 6 | TENS 000329 |
| 3/26/2012 | 11:05 am | Carter cell Worland, WY | Perkins office Mitchell, NE | 4 | TENS 000332 |
| 3/28/2012 | 1:25 pm | Carter cell Worland, WY | Perkins cell Scottsbluff, NE | 2 | TENS 000333; JP20130404-000131 |
| 4/2/2012 | 9:55 am | Perkins cell Scottsbluff, NE | Carter cell Worland, WY | 8 | TENS 000335; JP20130404-000133 |
| 4/4/2012 | 9:03 am | Perkins cell Scottsbluff, NE | Carter cell Worland, WY | 3 | TENS 000336; JP000201304-000134 |
| 4/4/2012 | 9:06 am | Perkins cell Scottsbluff, NE | Carter cell Greybull, WY | 5 | TENS 000336; JP20130404-000134 |
| 4/12/2012 | 8:43 am | Perkins cell Scottsbluff, NE | Carter cell Worland, WY | 3 | TENS 000339; JP20130404-000137 |


Ten Sleep 19

*Straits Financial LLC v. Ten Sleep Cattle Co.*
*No. 1:12-cv-06110*

Ten Sleep Su~~mmary Exhibit A~~

| DATE | TIME | CALL FROM | CALL TO | LENGTH (minutes) | SOURCE |
|---|---|---|---|---|---|
| 4/17/2012 | 7:53 am* | Perkins cell Chicago, IL | Carter cell Worland, WY | 3 | TENS 000341; JP20130404-000138 |
| 4/20/2012 | 10:34 am | Perkins cell Chicago, IL | Carter cell Worland, WY | 3 | TENS 000343; JP20130404-000140 |
| 5/4/2012 | 8:33 am | Perkins cell Scottsbluff, NE | Carter cell Worland, WY | 1 | JP20130404-000145 |
| 5/4/2012 | 9:02 am | Perkins cell Scottsbluff, NE | Carter cell Worland, WY | 1 | JP20130404-000146 |
| 5/4/2012 | 9:43 am | Perkins cell Scottsbluff, NE | Carter cell Worland, WY | 1 | JP20130404-000146 |
| 5/4/2012 | 10:24 am | Perkins cell Scottsbluff, NE | Carter cell Worland, WY | 1 | JP20130404-000146 |
| 5/4/2012 | 10:42 am | Perkins cell Scottsbluff, NE | Carter cell Worland, WY | 1 | JP20130404-000146 |
| 5/4/2012 | 11:05 am | Perkins cell Scottsbluff, NE | Carter cell Worland, WY | 1 | JP20130404-000146 |
| 5/4/2012 | 11:23 am | Perkins cell Scottsbluff, NE | Carter cell Worland, WY | 1 | JP20130404-000146 |
| 5/4/2012 | 11:58 am | Perkins cell Scottsbluff, NE | Carter cell Worland, WY | 1 | JP20130404-000146 |
| 5/4/2012 | 12:32 pm | Perkins cell Scottsbluff, NE | Carter cell Rawlins, WY | 2 | TENS 000349; JP20130404-000146 |
| 5/8/2012 | 6:59 am | Perkins cell Scottsbluff, NE | Carter cell Worland, WY | 1 | JP20130404-000146 |
| 5/8/2012 | 7:20 am | Perkins cell Scottsbluff, NE | Carter cell Worland, WY | 1 | JP2013-0404-000147 |
| 5/8/2012 | 7:21 am | Carter cell Rawlins, WY | Perkins cell Scottsbluff, NE | 4 | TENS 000351; JP20130404-000147 |

2

*Straits Financial LLC v. Ten Sleep Cattle Co.*
*No. 1:12-cv-06110*

Ten Sleep Summary Exhibit A

| DATE | TIME | CALL FROM | CALL TO | LENGTH (minutes) | SOURCE |
|---|---|---|---|---|---|
| 5/23/2012 | 11:32 am | Perkins cell Scottsbluff, NE | Carter cell Ten Sleep, WY | 3 | TENS 000359; JP20130404-000147 |
| 6/19/2012 | 9:45 am | Carter cell Ten Sleep, WY | Perkins cell Scottsbluff, NE | 7 | TENS 000368 |
| 6/19/2012 | 10:43 am | Carter cell Ten Sleep, WY | Perkins cell Scottsbluff, NE | 2 | TENS 000368; JP20130404-000160 |
| 6/20/2012 | 9:20 am | Carter cell Ten Sleep, WY | Perkins cell Scottsbluff, NE | 5 | TENS 000369; JP20130404-000161 |
| 6/20/2012 | 12:19 pm | Carter cell Ten Sleep, WY | Perkins cell Scottsbluff, NE | 2 | TENS 000369; JP20130404-000161 |
| 6/22/2012 | 8:02 am | Carter cell Ten Sleep, WY | Perkins cell Scottsbluff, NE | 13 | TENS 000370; JP20130404-000162 |
| 6/23/2012 | 8:53 am | Carter cell Ten Sleep, WY | Perkins cell Mitchell, NE | 2 | TENS 000370; JP20130404-000162 |
| 6/24/2012 | 6:30 pm | Carter cell Ten Sleep, WY | Perkins office Mitchell, NE | 2 | TENS 000371 |
| 6/24/2012 | 6:31 pm | Perkins cell Douglas, WY | Carter cell Ten Sleep, WY | 3 | TENS 000371; JP20130404-000163 |
| 6/25/2012 | 6:07 am | Perkins cell Casper, Wy | Carter cell Johnson Cty., WY | 1 | TENS 00371; JP20130404-000163 |
| 6/25/2012 | 7:45 am | Carter cell Casper, WY | Perkins cell Casper, WY | 2 | TENS 000371; JP20130404-000163 |
| 6/25/2012 | 7:57 am | Carter cell Casper, WY | Perkins cell Casper, WY | 2 | TENS 000371; JP20130404-000163 |
| 6/29/2012 | 11:11 am | Carter cell Ten Sleep, WY | Perkins cell Mitchell, NE | 5 | TENS 000374; JP20130404-000168 |

*Perkins' phone records indicate 8:53 am.

3