IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

| | |
|---|---|
| STRAITS FINANCIAL LLC, <br><br> Plaintiff, <br><br> v. <br><br> TEN SLEEP CATTLE CO., and RICHARD CARTER, <br><br> Defendants. <br><br> TEN SLEEP CATTLE CO., <br><br> Counter-Plaintiff and Third-Party Plaintiff, <br><br> v. <br><br> STRAITS FINANCIAL LLC, <br><br> Counter-Defendant <br><br> and <br><br> JASON PERKINS, <br><br> Third-Party Defendant. | Case No. 1:12-cv-06110 <br><br> Honorable James B. Zagel |

**STRAITS FINANCIAL LLC'S MEMORANDUM ON TEN SLEEP CATTLE COMPANY'S FAILURE TO MITIGATE DAMAGES**

Straits Financial LLC ("Straits"), by its attorney, submits the following

Memorandum on the issue of the failure of Ten Sleep Cattle Company ("Ten Sleep") to

mitigate its damages.

1

## I. GENERAL LAW ON MITIGATION OF DAMAGES

As this Court noted in its Decision, a party cannot recover for damages the party could have prevented through reasonable diligence and ordinary care. Known as the doctrine of mitigation of damages or of avoidable consequences, this rule imposes a duty on an injured party:

> to exercise reasonable diligence and ordinary care in attempting to minimize his or her damages or to avoid aggravating his or her injury. The injured party is required to use the same care and diligence as a person of ordinary prudence under like circumstances. The principal of mitigation of damages addresses conduct by the injured party that aggravates or increases the party's injury. … This doctrine states that a party cannot recover damages flowing from consequences which that party could reasonably have avoided. Often this is expressed as a duty on the party of the plaintiff to minimize his damages or an obligation to take reasonable action to avoid enhancing the damages caused by defendant.

Washington Courte Condominium Association-Four v. Washington-Golf Corp., 267 Ill. App. 3d 790, 643 N.E. 2d 199 (1st Dist. 1994), cited in paragraph 21 of Straits' Trial Brief (Docket 65) (discussing mitigation of damages principle to fraud and Consumer Protection Act claims).

Illinois courts have long recognized the applicability of this doctrine in all types of cases involving damages. As the Illinois Appellate Court held in Maere v. Churchill, 116 Ill. App. 3d 939, 946, 452 N.E. 694, 699 (3d Dist. 1983):

> The principle of avoidable consequences upon which the reduction of damages rule is grounded … finds its application in virtually every type of case in which the recovery of a money judgment or award is authorized.
>
> ….
>
> The general rule is that it is the duty of a party injured by the breach of contract of tort to make a reasonable effort to avoid damages therefrom, and such damages as might by reasonable diligence of this party have been avoided [sic] are not to be regarded as the natural and probable result of plaintiff's acts and

therefore there can be no recovery for damages which might have been avoided by reasonable effort on the party of the person injured…. [citations omitted]

The principle of mitigation of damages also has long been applied in cases involving unauthorized trading of commodity futures. In Sherwood v. Madda Trading Co., [1977-1980 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,728 at 23,018, 23,021 (CFTC 1979), the CFTC explained the rationale for the customer's mandatory duty to mitigate the customer's losses from unauthorized trading by bringing his dissatisfaction with the trades to the attention of his brokerage firm:

> Complaining to the responsible officer or agent of one's futures commission merchant is, in the Commission's view, the mandatory first step which a customer must take to mitigate damages upon discovery of unauthorized trading. The rationale behind this rule is simple. A substantiated complaint to a broker would immediately remove the burden of the unauthorized activity from the customer and give the person or entity with ultimate legal and financial responsibility for the trade an early opportunity to close the unauthorized position… By not complaining at the first reasonable opportunity, a customer, in effect, usurps the proper role of the persons ultimately responsible for the trade, the futures commission merchant and its officers and agents. Moreover, by failing to protest, the broker would undoubtedly presume the regularity of the unprotested transactions and knowingly forego potential opportunities to liquidate the positions. In the Commission's view, any aggravation of damages occurring as the result of a customer's undue silence should not be passed on to the futures commission merchant.

See also, Herman v. T&S Commodities, Inc., 592 F. Supp. 1406, 1420 (S.D. N.Y. 1984) (applying principle to claims for unauthorized trading under the Commodity Exchange Act); Tripi v. Prudential Securities, Inc., 303 F. Supp. 2d 349, 354-55 (S. D. N. Y. 2003) (arbitrators could reduce award in unauthorized trading case due to customer's failure to complain about trades despite receiving confirmations of alleged unauthorized trading).

3

As the Seventh Circuit held in Eastern Trading Co. v. Refco, Inc., 229 F. 3d 617, 625 (7th Cir. 2000) in addressing the related defense of ratification in an unauthorized trading case:

> The good ground for a defense of ratification (or, better, consent) here is that the partnership, though warned of Zahid's speculative propensities and unilateralism by the Republic episode, decided to leave the management of the commodities trading side of Eastern's business to him. They gave him carte blanche, not only in the terms of the customer agreement with Refco but also in their refusal to review his transactions or otherwise monitor or supervise, let alone participate in, his trading activities. They trusted him, and authorized him, to speculate responsibly. Although in the end his speculative trading was a flop, during much of the 18–month period of his trading through Refco he made money for the partnership. The partners were happy when things were going well, and they cannot, by a retroactive cancellation of his authority, shift the cost when things went badly to Refco, which in following Zahid's directions thought it was doing what the partnership wanted it to do. The partners were not defrauded if they authorized the conduct that they now denounce as fraud, either knowing exactly what Zahid was doing or choosing to turn a blind eye to it … or if they led Refco to believe that Zahid's risky trades were authorized. If the partners did not originally authorize his speculations, they either ratified them by failing to repudiate them upon discovery of them… or misled Refco into thinking they had ratified them. … [citations omitted]

## II. FACTS RELEVANT TO THE DEFENSE

The evidence adduced at trial relevant to the issue of mitigation of damages was essentially undisputed. This evidence included:

1. The allegedly unauthorized transactions in the "35" account began on March 19, 2012 and continued through June 2012. Allegedly unauthorized transactions occurred in this account on 20 separate days during that period:

    a. March 19, 2012;

    b. March 23, 2012;

    c. March 26, 2012;

    d. March 30, 2012;

  e. April 2, 2012;

  f. April 5, 2012;

  g. April 19, 2012;

  h. April 20, 2012;

  i. April 24, 2012;

  j. April 27, 2012;

  k. May 9, 2012;

  l. May 10, 2012;

  m. May 16, 2012;

  n. May 21, 2012;

  o. May 24, 2012

  p. May 25, 2012;

  q. May 29, 2012;

  r. May 31, 2012;

  s. June 1, 2012;

  t. June 4, 2012.

2. On each of these dates, Straits mailed a "confirmation of trading activity" to Ten Sleep at Carter's home address, Carter and Ten Sleep had designated in their account opening documents at the address to which mail should be sent to Ten Sleep. Strait's policy (and the requirements of the CFTC Regulations) is to send out such confirmations to all accounts that had transactional activity (purchase, sale, deposit or withdrawal) on the date in question, and that the

confirmations are placed in the U.S. Mail for delivery the morning after the statement is generated.

3. Straits never received back any of the statements as "undeliverable" or "addressee not found".

4. Ten Sleep and Carter do not contest that these confirmations were received at Carter's home address in a regular fashion.

5. One of the purposes of the confirmations sent to account holders is to "confirm" to them all activity in their accounts and to provide the account holders with a means to monitor the trading activity in their accounts.

6. There is no claim that any of the information provided in the account confirmations was inaccurate or incomplete in any way.

7. Neither Straits nor Perkins, nor anyone else, told Carter or Ten Sleep not to review the confirmations or to otherwise ignore the information contained in them.

8. Duplicate copies of the statements were sent to Ten Sleep's bank.

9. The first page of each of the confirmations had a section labeled "CONFIRMATION: THE FOLLOWING TRADES HAVE BEEN MADE THIS DAY FOR YOUR ACCOUNT AND RISK".

10. Each of the statements sent to Ten Sleep correctly showed the allegedly unauthorized trading activity on the day of the statement.

11. Carter, on behalf of Ten Sleep, was capable of reading and understanding the language of this section of the confirmations. Carter admitted that, had he read the statements, he would have realized that the trading was unauthorized.

12. Carter, on behalf of Ten Sleep, was capable of reading and understanding that this section of the confirmations reflected trades in the "35" account on the dates of the respective statements, even though he had allegedly instructed that no further trading should occur in this account after March 16, 2012..

13. Carter, on behalf of Ten Sleep, received statements from Straits on the "33" account" and had received similar statements from RJO when the account was at that firm.

14. In addition to the daily activity confirmation statements, Straits also mailed to Ten Sleep at Carter's home address monthly activity statements on the last trading day of each month showing the trading activity in the "35" account for that month. Such statements were mail to Carter on March 31, 2012, April 29, 2012 and May 31, 2012. These statements reflect all of the allegedly unauthorized activity in the "35" account during each of those months. Carter does not contest that these statements were received at his house. Carter also was capable of reading these monthly statements and understanding the fact that trading had occurred in the account during those months, even though he had allegedly instructed that no further trading take place after March 16, 2012.

15. Carter claims that for much of the time period in question, he was not at home but was in remote, largely inaccessible areas tending his cattle. He testified that the "remote" area that he was in was in or near Rawlins, Wyoming. A MapQuest Internet request for directions reveals that Rawlins is some 237 miles from Ten Sleep. However, according to even the redacted cell phone

logs in evidence at the hearing, which show only calls between Carter and Perkins or Carter and his accountant, Perkins was in Ten Sleep itself, his home town, on May 11, 12, 23 and 24, 2012 [Joint Exhibit 23]. However, the redacted phone records also show that Carter was in or near Worland, Wyoming, some 26 miles from Ten Sleep according to MapQuest, on March 26, April 2, April 4, April 10, April 12, April 13, April 17, April 20, and April 30, 2012. [Id.] Far from being a "remote, inaccessible" area, Worland is the nearest population center to Ten Sleep, a mere half hour away by car.

16. Carter testified that when he was gone, his wife would open the mail and leave it out for him when he returned. When he would return home, he simply took all Straits-related mail and put it in his desk drawer without opening or looking at it. Carter was at home on at least the following dates during the relevant time period:

17. During the relevant time period, Ten Sleep did not engage in any trading activity in the "33" account.

18. The only activity that occurred during this time period in the "33" account was the receipt of funds from Ten Sleep's account at the Farm Credit Bank and the disbursement of funds from that account to Ten Sleep.

19. Straits mailed daily confirmation of transactions in the "33" account to Ten Sleep at Carter's address reflecting these transactions on each of the following 7 days during this time period:

    a. March 19, 2012
    b. April 2, 2012;

8

  c. April 12, 2012;

  d. April 17, 2012;

  e. May 4, 2012;

  f. May 8, 2012;

  g. May 23, 2012;

21. The daily confirmation statements for the "33" account were mailed separately from the daily confirmation statements for the "35" account.

22. Straits also mailed monthly account activity statements for the "33" account to Ten Sleep at Carter's address on March 31, 2012, April 30, 2012 and May 31, 2012. These were mailed separately from the monthly accounts statements for the "35" accounts.

23. A comparison of the statements sent for the two accounts reveals the following, assuming that Carter had instructed Perkins to stop trading after March 16, 2012:

 a. For the month ending March 31, 2012, Ten Sleep/Carter received a total of 5 daily confirmations for the "35" account, but should have anticipated only 1 for the "33" account.

 d. Ten Sleep/Carter received two confirmation statements for March 19, 2012, when he should have anticipated only 1;

 c. Ten Sleep/Carter received two monthly statements postmarked March 31, 2012, which he should have anticipated only 1;

   d. For the month ending April 30, 2012, Ten Sleep/Carter received a total of 9 confirmations for the two accounts, but should have anticipated only receiving three for the "33" account.

   e. Ten Sleep/Carter received two statements for April 2, 2012 and for the month end, when he should have anticipated receiving only 1 for each day;

   f. For the month ending May 31, 2012, Ten Sleep/Carter received a total of 12 daily statements, when they should have anticipated receiving only 3 for the "33" account.

24. Each of the daily confirmation and monthly activity statements for the "35" account contained the telephone number, mailing address and internet address of Straits [Joint Exhibit 19].

### III. ANALYSIS

   The foregoing evidence demonstrated that Straits provided frequent, timely and accurate account information to Ten Sleep/Carter over a two and one half month period which clearly and easily revealed the transactions that Ten Sleep now claims were unauthorized. This evidence also demonstrated that Carter was, at a minimum, capable of reading the portion of the statements that identified these transaction and that, had he done so at any time during the two and one half month period, he would have realized that trades were being placed in his account that he had not authorized and in fact had instructed not to occur.

   Therefore, this is a unique case. In many situations like this involving unauthorized trading, one finds situations involving (a) a broker instructing the client not to read the statements; (b) a broker telling a client that the statements

were "wrong" or that the "home office" is working on correcting them; (c) a customer who is not capable of understanding the statements or of realizing that the statements contradicted what the customer was being told by the customer's broker; (d) statements that were doctored or otherwise erroneous; (e) statements that were not received by the customer in a timely manner, perhaps because the customer was out of the country and not taking mail delivery, or were otherwise misdirected to the customer; (f) transactions that were impossible for a layperson to decipher as to wrongdoing (for example, churning cases where expert analysis would be necessary to determine the churning); (g) a single unauthorized transaction buried within a whole series of legitimate transactions, making it difficult to spot; (h) information that would have revealed the alleged unauthorized trading was otherwise not available to the customer or was available only at great cost or inconvenience to the customer.

None of those factors are present in this case. Rather, the alleged unauthorized trades, if they were such, stuck out like a red flag for anybody of Carter's intelligence and trading experience to easily identify, as he admitted at the trial.

Carter proffers two excuses for not even once looking at total of 23 pieces of mail from Straits during the relevant time period containing all the information he needed to inform Straits of the allegedly unauthorized trades in Ten Sleep's account. Simply put, these excuses are that (1) he was away from his home during much of this time and (2) that when he was home, he was either too tired

11

to look at his mail or didn't think to do so because he assumed that there was no trading in the "35" account.

Neither of these excuses justifies Ten Sleep and Carter turning a blind eye to the accurate and readily available trading information that Straits gave him on multiple occasions. With virtually no effort and with little diligence (the mere opening of one of the more than twenty envelopes he received from Straits showing the trading), he would have readily been able to detect any alleged wrongdoing in his account and contact Straits-one of the main purposes for the requirement that an FCM like Straits immediately "confirm" transactional activity in customers' accounts..

That he appears to have been out of town for multiple days during this time period does not excuse his failure to do so. That fact is that he was in his town of Ten Sleep, Wyoming at least 4 days during the relevant time period and within easy driving distance on multiple other days. In any event, when he came home, Carter apparently unilaterally chose to ignore the statements that his wife had opened for him and throw them in his desk drawer without looking at them. Carter and Ten Sleep cannot claim that their unilateral failure to take the simple step of reviewing their Straits mail even once during this time period excuses them from their duty to mitigate, which requires at least minimum effort to stop the aggravation of damages. Such a precedent would allow any claimant asserting unauthorized trading to claim that they were too busy to read their statements, turn a "blind eye" to the information before them, and therefore assert should not be held responsible for losses they could have prevented.

Similarly, Carter's claim that he did not think he had to review the statements because he believed that there would be no further trading in the "35" account after March 16, 2012, even if true, doesn't excuse his inattention to the statements. It was not reasonable for Carter and Ten Sleep to ignore the veritable plethora of statements and information he was receiving from Straits during this time period. Moreover, the amount of communications he was receiving far exceeded the amount of statements that he should have reasonably anticipated receiving from Straits if the only trading was occurring in the "33" account and no trading was occurring in the "35" account. If Carter and Ten Sleep truly had instructed Perkins to stop trading after March 16, they should not have been receiving so much mail, much more than they had ever received before. This alone is sufficient to have raised with Carter and Ten Sleep a question of why they were receiving this volume of communications, and to have led Carter and Ten Sleep to do the absolute minimum a reasonable person would have done: open at least one or some of the mail, and thereby discover the alleged authorized trades.

### III. TEN SLEEP'S DAMAGES MUST BE REDUCED BECAUSE TEN SLEEP'S FAILURE TO MITIGATE ITS DAMAGES GREATLY AGGRAVATED THE LOSS IN THE "35" ACCOUNT

At the trial, Straits put in undisputed evidence that Carter's and Ten Sleep' utter failure to fulfil their duty to review their account statements at any time during the alleged period of unauthorized trading prevented Straits from having an opportunity to intercede in the account, stop the trading and staunch the flow of red ink in the account.

It is undisputed that on March 16, 2012, Ten Sleep withdrew $300,000 from its "35" account, representing profits from trading that Perkins had done in that account.

The account values of the "35" account, as reflected in the confirmations and monthly statements send to Ten Sleep starting on March 16, 2012, the date of the alleged instruction to stop trading, are as follows [Joint Exhibits 19 and 20]:

| Date | Account value | Cumulative Gain (Loss) |
|---|---|---|
| March 16, 2012: | $214,709.01 | _ |
| March 19, 2012: | $226,904.41 | $11,195.40 |
| March 23, 2012: | $112,233.11 | ($102,475.90) |
| March 26, 2012: | $120,112.21 | ($94,597.80) |
| March 30, 2012: | $203,014.31 | ($11,694.70) |
| April 2, 2012: | $174,876.01 | ($38,833.00) |
| April 5, 2012: | $135,539.91 | ($79,169.10) |
| April 19, 2012: | ($552,931.39) | ($767,640.40) |
| April 20, 2012: | ($441,313.19) | ($656,022.20) |
| April 24, 2012: | ($425,007.49) | ($649,716.50) |
| April 27, 2012 | ($479,057.19) | ($693,766.20) |
| April 30, 2012 | ($504,057.19) | ($718,766.20) |
| May 9, 2012: | ($794,001.49) | ($1,008,710.50) |
| May 10, 2012: | ($740, 620.79) | ($955,329.80) |
| May 16, 2012: | ($1,050,685.99) | ($1,265,395.00) |
| May 21, 2012: | ($872.908.99) | ($1,087,618.00) |

| | | |
|---|---|---|
| May 24, 2012: | ($819,756.89) | ($1,034,465.90) |
| May 25, 2012 | ($901,339.39) | ($1,116,048.40) |
| May 29, 2012 | ($1,000,033.69) | ($1,214,742.70) |
| May 31, 2012 | ($1,429,170.29) | ($1,643,879.30) |
| June 1, 2012 | ($1,553.739.59) | ($1,768,448.60) |
| June 4, 2012 | ($1,446,517.49) | ($1.661.216.50) |
| June 20, 2012 | ($1,992,043.79) | ($2,206,752.80) |

The evidence was also clear that the losses in the account were due almost exclusively to positions that had been initiated in the account in late March and the first days of April 2012 and held until the account was liquidated. In other words, these same positions were in the account for some three months. Had Carter and Ten Sleep even one time opened one of their voluminous communications from Straits on this account, they would immediately have realized that the positions did not belong in their account. Had they then contacted Straits at any time up to nearly nine weeks after the alleged unauthorized trading began, their loss would have been substantially less. Rather, their failure to take even minimal steps to inquire into the reason they were receiving so much communication about the account caused their losses to increase and aggravate.

## IV. CONCLUSION

The Court has held that Ten Sleep failed to mitigate damages by never inquiring about the transactions in its "35" account despite circumstances that should have given Ten Sleep and Carter pause. Ten Sleep's failure to exercise reasonable diligence and ordinary care in attempting to minimize the damages after its "injury" had been inflicted

15

means that its damages should be reduced by the amount of damages that could have reasonably been avoided. Ner Tamid Congregation of North Town v. Krivorunchko, 638 F. Supp. 2d 913, 919-20 (N.D. Ill. 2009)

Straits suggests to the Court that Carter's and Ten Sleep's failure to mitigate their damages should, in this case, reduce Ten Sleep's damages to $79,169.10, the amount of their loss following the trading acvitiy in the "35" account on April 5, 2012, more than two weeks after the alleged March 16, 2012 instruction not to continue trading.[1] During that time period, Carter and Ten Sleep received multiple communications from Straits documenting the trading activity that led to this loss. By ignoring them, they allowed the losses to being mounting and to continue mounting until they reached the large number that Ten Sleep now claims as its damages.

By comparison, the total gross amount of commissions that Straits received from the trading in the "35" account after March 16, 2016 was approximately $90,000, of which it paid more than $70,000 to Perkins as his portion of the commissions [Joint Exhibits 20, 22]. Straits urges this Court, in determining the proportion of the loss to be attributed to Ten Sleep's failure to mitigate its damages, to consider that awarding Ten Sleep the amount it claims will effectively cause Straits to lose more than $2,200,000 (including the approximately $160,000 debit in the "35" account). This "zero sum game" is precisely the unfair result that has led courts to insist that injured parties take reasonable steps to minimize their damages. This is also the further basis for the CFTC's insistence on mitigation of damages: to avoid the harm that a customer's failure to

[1] Counting the $300,000 in "profits" that Ten Sleep withdrew from the "35" account on March 16, 2012, as this date the account was still in overall profit from inception.

exercise such a simple precaution as looking at an account statement could cause a financial firm, and, by extension, the financial markets as a whole.

                                                                  s/Howard J. Stein

                                                                  Attorney for Straits Financial LLC

Howard J. Stein
30 N. LaSalle St.
Suite 2040
Chicago, IL 60602
312.726.4514
hsteinlaw@aol.com
N.D. IL. No. 2116208

## CERTIFICATE OF SERVICE

Howard J. Stein, one of the attorneys for Straits Financial LLC, hereby certifies that he served a copy of the foregoing Memorandum on Ten Sleep Cattle Co.'s Failure to Mitigate Damages upon all counsel or record by the Court's CM/ECF system this 29th day of February 2016.

                                                                  s/ Howard J. Stein