# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| STRAITS FINANCIAL LLC, | ) |
| Plaintiff, | ) |
| v. | ) |
| TEN SLEEP CATTLE CO. and RICHARD CARTER, | ) |
| Defendants. | ) |
| | ) |
| TEN SLEEP CATTLE CO. and RICHARD CARTER, | ) Case No. 1:12-cv-06110 |
| Counter-Plaintiffs and Third-Party Plaintiff, | ) Honorable Manish Shah |
| v. | ) |
| STRAITS FINANCIAL LLC, | ) |
| Counter-Defendant, | ) |
| and | ) |
| JASON PERKINS, | ) |
| Third-Party Defendant. | ) |

## TEN SLEEP CATTLE CO. AND RICHARD CARTER'S MEMORANDUM IN SUPPORT OF MOTION FOR ENTRY OF JUDGMENT

Ten Sleep Cattle Co. and Richard Carter (collectively "Ten Sleep"), by their attorneys and pursuant to the Opinion and Final Judgment issued by the Seventh Circuit Court of Appeals on August 13, 2018 (Dkt. ## 176, 177), move this Court for entry of judgment in the amount of $2,206,754.80, plus prejudgment interest in the amount of $309,867.67 and post-judgment interest calculated on a compounded annual basis at the rate of 0.65% until paid in full, and attorneys' fees. In support of this Motion, Ten Sleep states as follows:

## Relevant Procedural History

This matter is on remand from the Seventh Circuit Court of Appeals. On August 13, 2018, the Court of Appeals entered an order remanding the case for a recalculation of Ten Sleep's damages. (Dkt #175 (certified copy of 7th Circuit opinion, attached as Exhibit A (the "Opinion").)

This matter has an extensive procedural history that will not be unnecessarily repeated here. The following, however, is a brief synopsis of the procedural history and relevant facts that are important to this Petition for supplemental attorneys' fees.

This is an unauthorized trading case. During a three-month period, Straits Financial LLC's employee, Jason Perkins, embarked on a spree of unauthorized trading, resulting in over $2 million in losses and a $168,000 margin debit balance in Ten Sleep's accounts. Straits sued Ten Sleep for the margin debit balance. Ten Sleep counterclaimed for all damages related to the unauthorized trading and fraud. (Dkt #6.) After motion

2

practice and discovery, this case proceeded to trial in front of Judge Zagel from September 3, 2014 through September 11, 2014. (Dkt. # #71-77.)

On December 16, 2015, the Court issued its Findings of Fact, Conclusions of Law and Order. (Dkt. #83.) In that Order, the Court found in favor of Ten Sleep on all of its counterclaims. Specifically, the Court found Straits and Perkins liable for violation of the Commodities Exchange Act, unjust enrichment and breach of fiduciary duty. The Court further found Straits liable for violation of the Illinois Consumer Fraud Act, 805 ILCS 505 *et seq*. ("ICFA") and conversion. Having found Straits liable for violating the ICFA, the Court ordered Straits to pay reasonable attorneys' fees. (Dkt. #83 at 8.)

After additional briefing on issues such as prejudgment interest and mitigation of damages, the Court entered judgment in favor of Ten Sleep on October 14, 2016, in the total amount of $1,661,366.20, plus further prejudgment interest in the amount of $2,336.22, plus per diem interest in the amount of $2,336.22, for a total of $1,663,443.84. (Dkt. ##113, 121.) As discussed at length in Ten Sleep's Motion for Entry of Amended Judgment, even though Judge Zagel found in favor of Ten Sleep on all of its counterclaims, he awarded Ten Sleep reduced damages for failure to mitigate. (Dkt. # 83, 113.)

Straits filed its Notice of Appeal from the October 14, 2016 judgment on November 7, 2016. (Dkt. #118; 7th Cir. Case No. 16-3860). Perkins filed his notice of appeal on November 10, 2016 the judgment. (Dkt. #125, 7th Cir. Case No. 16-3903.) Ten

Sleep filed its notice of cross-appeal on November 21, 2016. (Dkt. #134, 7th Cir. Case No. 16-3967.)

Meanwhile, the issue of attorneys' fees had not been resolved in the district court. Accordingly, on October 27, 2016, Ten Sleep filed its Petition for Attorneys' Fee and Non-Taxable Costs. (Dkt. #115.) Judge Shah issued an order on May 2, 2017 awarding Ten Sleep $322,260.20 in attorneys' fees. (Dkt. #162.) Straits appealed Judge Shah's order by filing its second Notice of Appeal on May 26, 2017. (Dkt. #164, 7th Cir. Case No. 17-2100.) Straits' second appeal was subsequently consolidated with the three prior appeals.

One December 5, 2017, the case was argued in front of Judges Hamilton, Rovner and Chief Judge Wood. On August 13, 2018, the panel issued its opinion: (1) affirming Judge Shah's order granting Ten Sleep attorneys' fees in the amount of $322,260.20; and (2) reversing and remanding the judgment entered by Judge Zagel in favor of Ten Sleep for a recalculation of damages because, the Panel found, Judge Zagel erroneously held that Ten Sleep had a duty to mitigate its damages before it knew of its injury.

**Argument**

A.     **Damages Calculations**

Ten Sleep's damages are as follows:

| Date | Liquidation Value of 35 Account | Value of 35 Account on 3/16/2012 | Total Damages |
|---|---|---|---|
| June 20,2012 | $ 1,992,045.79 | $ 214,709.01 | **$ 2,206,754.80** |

This is the methodology the parties have used for calculation of damages throughout this case. (*See, e.g.*, Dkt. ##89, 107, 108-1.) Indeed, it is the methodology the Court (Zagel, J.) used in entering judgment in favor of Ten Sleep (Dkt. #113), albeit with a reduction for failure to mitigate, which the Seventh Circuit found to be in error. Importantly, on appeal Straits did not challenge the formula used to calculate damages; it merely argued that damages should be calculated—using the same formula—as of some earlier date. In other words, Straits did not argue that the District Court erred in calculating the amount of damages; it merely argued that the District Court erred in rejecting Straits' affirmative defenses. As such, Straits has waived any arguments with respect to the formula to be used to calculate damages. *See Ward v. Soo Line R.R. Co.*, Case N. 17-2150, 2018 U.S. App. LEXIS 24222, at *33-34 (7th Cir. Aug. 27, 2018).

Moreover, Straits tried, unsuccessfully, to persuade Judge Zagel to offset the $168,000 debit balance, to account for the fact that Straits paid the $168,877.02 debit balance. (Dkt. #108.) Judge Zagel rejected that argument, stating:

> Straits' request to subtract the debit balance of the 35 account is denied. As Ten Sleep notes, Straits did not mitigate its own alleged damages during this time because it failed to contact Carter to alert him of the growing margin deficit or otherwise act to stem the losses. Moreover, although the

account deficit arose after the liability cut-off date of June 11, 2012, the deficit only existed as a result of Straits' unauthorized trading during the period of liability. It would be inequitable to penalize Carter not only for the losses that accrued after June 11, but for the margin debit that arose because of the unauthorized trading activity prior to that date.

(Dkt. #111.) Straits did not challenge this finding on appeal either, so this argument is waived as well. *Ward*, 2018 U.S. App. LEXIS at *33-34.

The methodology Ten Sleep used to calculate its damages is correct, because Carter told Perkins to shut down the 35 account on March 16, 2012 and send him the proceeds. Unbeknownst to Carter, Perkins only sent $300,000 from the account, leaving $214,709.01 in the account to continue his unauthorized trading. That money belongs to Ten Sleep, not Straits. The full measure of Ten Sleep's damages is $2,206,754.80.

## B.    Prejudgment Interest Calculations

By order dated March 29, 2016 (Dkt. #98), the Court awarded Ten Sleep and Carter prejudgment interest calculated on a simple basis at the prime rate on June 10, 2012. The prime rate from December 16, 2008 to December 17, 2015 was 3.25%.

http://www.fedprimerate.com/wall_street_journal_prime_rate_history.htm (last visited October 8, 2018). Per diem interest calculations are set forth in the table below:

| Total Damages | Prime Rate | Annual interest | Per diem interest | Total prejudgment interest[1] |
|---|---|---|---|---|
| $ 2,206,754.80 | 3.25% | $ 71,719.53 | $196.49 | **$ 309,867.67** |

---

[1] June 20, 2012 to October 14, 2016 is 1,577 days x $196.49 = $309,867.67.

6

### C.    Post-Judgment Interest Calculations

Post-judgment interest is calculated as follows:

| Damages plus prejudgment interest | Compound interest rate | Year 1 post-judgment interest[2] | Year 2 post-judgment interest[3] | Per diem interest in Year 2[4] | Per diem interest in Year 3[5] | Damages plus pre- and post-judgment interest as of 10/11/2018 |
|---|---|---|---|---|---|---|
| $2,516,622.47 | 0.650% | $16,358.05 | $16,374.93 | $45.11 | $45.40 | $2,549,355.45 |

Hence, as of October 11, 2018, Ten Sleep is owed a total of $2,549,355.45, plus attorneys' fees.

### D.    Attorneys' fees

By order dated May 2, 2017, the Court awarded Ten Sleep a total of $322,260.20 in attorneys' fees and taxable costs. (Dkt. #162.) The Seventh Circuit upheld that order on appeal. (Dkt. #175 at 24-25.) The Seventh Circuit further stated in its Opinion that "a supplemental fee award for appellate work may be needed." (*Id*. at 31.) Accordingly, Ten Sleep has separately filed a Petition for Supplemental Award of Attorneys' Fees, seeking an additional $155,772.50.

---

[2] Damages + prejudgment interest = ($2,206,754.80 + $309,867.67) = $2,516,622.47 x .0065 = $16,358.05.

[3] Damages + prejudgment interest + Year 1 post-judgment interest = ($2,206.754.80 + $309,867.67 + $16,358.05) = $2,532,980.52 x .0065 = $16,464.37. As of October 11, 2018, Year 2 post-judgment interest is $16,374.93.05 ($45.11 x 363 days).

[4] Per diem interest for Year 2: $16,464.37 / 365 days = $45.11/day.

[5] Per diem interest for Year 3: $16,571.39 / 365 days = $45.40/day.

**E.     Costs on Appeal**

The Seventh Circuit taxed costs for the appeal in favor of Ten Sleep in the

amount of $688.00. (Dkt. #179.)

**Conclusion**

For the reasons set forth above, Ten Sleep Cattle Co. and Richard Carter

respectfully request that this Court enter judgment in their favor, as follows:

| | |
|---|---|
| Damages | $2,206,754.80 |
| Prejudgment interest | 309,867.67 |
| Post-judgment interest[6] | 32,732.98 |
| Attorneys' fees | 322,260.20 |
| Supplemental attorneys' fees | 155,722.50 |
| Costs on appeal | $688.00 |
| **TOTAL** | **$3,028,026.15** |

Dated: October 9, 2018                    Respectfully submitted,


                                          /s/ Nancy L. Hendrickson
                                          One of the attorneys for Ten Sleep Cattle
                                          Co. and Richard Carter

Nancy L. Hendrickson
ARDC No. 6207710

---

[6] Calculated as of October 11, 2018. Straits owes an additional $45.11/day through October 13, 2018 and $45.40/day thereafter, until paid in full.

KAUFMAN DOLOWICH & VOLUCK
135 S. LaSalle St. Suite 2100
Chicago, IL 60603
(312) 863-3663
nhendrickson@kdvlaw.com

## CERTIFICATE OF SERVICE

Nancy L. Hendrickson, an attorney, hereby certifies that on October 9, 2018 she caused a copy of ***Ten Sleep Cattle Company's and Richard Carter's Memorandum in Support of Motion for Entry of Judgment*** to be served via the Court's ECF/electronic mailing system upon:

Howard J. Stein
Attorney at Law
70 West Madison Street
Suite 2100
Chicago, IL 60602
hsteinlaw@aol.com


James McGurk
10 South LaSalle Street
Suite 3300
Chicago, IL 60603
jamcgurk@flash.net


/s/ Nancy L. Hendrickson

# EXHIBIT A

Case: 1:12-cv-06510 Document #: 481-1 Filed: 10/09/18 Page 12 of 42 PageID #:3642
Case: 1:12-cv-06510 Document #: 175 Filed: 09/21/18 Page 1 of 31 PageID #:3564
Case: 16-3860      Document: 00713289379      Filed: 09/20/2018

CERTIFIED COPY

A True Copy

Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

### For the Seventh Circuit

_____

No. 16-3860

STRAITS FINANCIAL LLC,

*Plaintiff-Appellant,*

*v.*

TEN SLEEP CATTLE COMPANY
and RICHARD CARTER,

*Defendants-Appellees.*

_____

Nos. 16-3903, 16-3967, 17-2100

TEN SLEEP CATTLE COMPANY
and RICHARD CARTER,

*Counter-Plaintiffs/Third-Party Plaintiffs-Appellees/*
*Cross-Appellants,*

*v.*

STRAITS FINANCIAL LLC,

*Counter-Defendant-Appellant/Cross-Appellee,*

and

JASON PERKINS,

*Third-Party Defendant-Appellant/Cross-Appellee*

_____

Case: 1:12-cv-06110 Document #: 181-1 Filed: 10/02/18 Page 13 of 42 PageID #:3643
Case: 1:12-cv-06110 Document #: 173 Filed: 09/21/18 Page 2 of 31 PageID #:3390
Case: 16-3860      Document: 00713289379      Filed: 09/20/2018      Pages: 31

2                        Nos. 16-3860, 16-3903, 16-3967 & 17-2100

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12-CV-6110 — **James B. Zagel** and **Manish S. Shah**, *Judges*.

_____

ARGUED DECEMBER 5, 2017 — DECIDED AUGUST 13, 2018

_____

Before WOOD, *Chief Judge*, and ROVNER and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Atop the Chicago Board of Trade Building in downtown Chicago stands Ceres, the Roman goddess of agriculture and grain. She faces north, but her reach extends at least as far west as Ten Sleep, Wyoming, to the family cattle ranch of defendant-appellee Richard Carter. In 2010, through a broker in Scottsbluff, Nebraska, Carter opened a commodities futures and options trading account with a Chicago-based financial institution. Carter intended to use the account to secure the prices his ranch—defendant-appellee Ten Sleep Cattle Company—would receive for its cattle using various financial instruments.[1]

At the same broker's behest, Carter opened another account in 2011 with plaintiff-appellant Straits Financial to speculate in other investment categories. After Carter and the broker split a tidy profit of $300,000, Carter instructed the broker to close out the account in March 2012. The broker did not follow those instructions. Instead, he continued speculating

_____

[1] Because Carter ran Ten Sleep and personally guaranteed Ten Sleep's obligations arising from its livestock hedging account, we refer to Carter and Ten Sleep interchangeably in this opinion.

Case: 1:12-cv-06510 Document #: 181-1 Filed: 10/09/18 Page 14 of 42 PageID #:3644
Case: 1:12-cv-06510 Document #: 817-1 Filed: 09/21/18 Page 3 of 31 PageID #:3591
Case: 16-3860     Document: 00713289379     Filed: 09/20/2018     Pages: 31

on U.S. Treasury Bond futures, losing approximately $2 million over the course of the next three months before his unauthorized trading was stopped. Straits Financial then liquidated Carter's livestock commodities holdings to satisfy most of that $2 million shortfall, and turned to the courts for the remaining deficiency. After a bench trial, Carter prevailed on most points and established his ranch's right to the seized funds and an award of attorney fees. However, the district court significantly reduced the amount of damages, finding that Carter had failed to mitigate his ranch's damages by not closely reading account statements and trading confirmations during his broker's trading spree.

Straits Financial and Perkins have appealed, and Carter and Ten Sleep have cross-appealed. We must decide three principal issues: whether the district court correctly interpreted and applied the contracts governing Ten Sleep's relationship with Straits Financial; whether the award of attorney fees was proper; and whether Ten Sleep's damages should have been reduced under Illinois law. We affirm the district court's judgment on the first two questions, but we reverse and remand in part for recalculation of Ten Sleep's damages.

I.   *Factual Background and Procedural History*

   A.   *The 33 Account and 35 Account*

As our western colleagues know, "cattle ranching is a hazardous business." *Wootten v. Wootten*, 159 F.2d 567, 574 (10th Cir. 1947). Unexpected fluctuations in the price of cattle can wipe out a family-run cattle operation. Covering the expenses of feeding, trucking, and pasturing cattle—plus all the other costs of running a ranch—is a perennial challenge. Ten Sleep's annual gross revenues in 2010 and 2011 were between $24 and

Case: 1:12-cv-06110 Document #: 481-1 Filed: 10/22/18 Page 15 of 42 PageID #:3645
Case: 1:12-cv-06110 Document #: 317-3 Filed: 09/21/18 Page 4 of 31 PageID #:3592
Case: 16-3860    Document: 00713289379    Filed: 09/20/2018    Pages: 31

$26 million, but the profit margins even in good years were less than 5%. To protect his business, in March 2010, Carter opened a commodity futures and options trading account with a futures commission merchant, R.J. O'Brien (RJO for short). Carter intended to use this account to protect his profit by locking in the price Ten Sleep would receive for its cattle later in the year. He did so by using options and other risk-reducing investment positions. In other words, Carter initially sought to "hedge" cattle. See generally *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 357–60 (1982) (describing commodities trading and hedging).

Carter set up this hedging account through his broker, Jason Perkins, who at the time was affiliated with RJO. This account, which the parties refer to as the "33 Account" for the last two digits of the account number, was established by an account agreement with RJO. The RJO agreement included a personal guarantee that required Carter to assume any debts owed by Ten Sleep to RJO. Specifically, that guarantee pledged "full and prompt payment to RJO of all sums owed to RJO by Customer pursuant to the [foregoing] Account Agreement, whether such sums are now existing or are hereafter created." In a section titled "DEBIT BALANCES," the agreement also allowed RJO to use any account balances or deposits to offset losses and expenses, and empowered RJO to pursue Ten Sleep for any remaining deficiencies. RJO also reserved the right to assign the account to another registered futures commission merchant. The RJO agreement did not include a mandatory arbitration clause, though it required Ten Sleep to dispute transactions within one year of the transaction date either through an administrative proceeding at the Commodity Futures Trading Commission or through a lawsuit or arbitration in the Northern District of Illinois. The RJO

Case: 1:12-cv-06510 Document #: 181-1 Filed: 10/22/18 Page 16 of 42 PageID #:3646
Case: 1:12-cv-06510 Document #: 173 Filed: 09/21/18 Page 5 of 31 PageID #:3593
Case: 16-3860      Document: 00713289379      Filed: 09/20/2018      Pages: 31

Nos. 16-3860, 16-3903, 16-3967 & 17-2100                5

agreement provided that Illinois law would govern. Through the RJO agreement, Ten Sleep consented to the jurisdiction of the state and federal courts and arbitration forums in the Northern District of Illinois.

The 33 Account existed solely to protect against losses in Ten Sleep's cattle business and was used in accordance with that purpose. After about a year, in April 2011 Perkins moved his brokerage from RJO to plaintiff-appellant Straits Financial, where he became an employee and the manager of a branch office. As part of the "bulk transfer process" of moving accounts from RJO to Straits Financial, all of Perkins's customers, including Ten Sleep, received a "negative consent letter." The letter advised them that their accounts would be transferred unless they objected. See 17 C.F.R. § 1.65(a)(2) (2011) (requiring notice and "a reasonable opportunity to object" to such transfers). By a separate assignment agreement with RJO, which Carter did not see, Straits Financial took control of the 33 Account and its associated personal guarantee. Ten Sleep did not sign any transfer agreement with Straits Financial, and Carter did not give any explicit personal guarantees directly to Straits Financial at any time.

A few months later, in May 2011, Perkins approached Carter with a new idea: opening a speculative trading account with Straits Financial where Perkins would have discretion to invest Carter's money without prior authorization. Perkins assured Carter that he would simply "nibble around the edges" using this freedom, and that there would be "no margin calls," i.e., no demands for Carter to put new capital into the account in light of Perkins's speculative trades. Dkt. 83 at 3 (Judge Zagel's findings of fact); see also *ADM Investor Services, Inc. v. Ramsay*, 558 F. Supp. 2d 855, 857 n.3 (N.D. Ill. 2008)

Case: 1:12-cv-06610 Document #: 187-1 Filed: 10/09/18 Page 17 of 42 PageID #:3647
Case: 1:12-cv-06610 Document #: 187-1 Filed: 09/21/18 Page 6 of 31 PageID #:3594
Case: 16-3860      Document: 00713289379      Filed: 09/20/2018      Pages: 31

(explaining "margin call" in context of futures trading) (citation omitted). In this conversation, Perkins proposed that he and Carter share the profits equally, and Carter agreed.[2]

No written authorizations or contracts documented this agreement, aside from Carter's signature on Straits Financial's one-page Related Account Authorization form, on which Perkins indicated that the new account was merely for "Record Keeping Purposes." The authorization form attempted to incorporate by reference "existing account documentation including but not limited to agreements … maintained and existing on file with Straits," and all existing "terms and conditions." The authorization form did not, however, specifically identify any of the documentation, terms, or conditions that would carry over to the new account. Within

---

[2] Perkins did not tell Carter that their profit-sharing agreement ran afoul of Straits Financial's policies and commodities industry rules. See National Futures Association, Rule 2-3, https://www.nfa.futures.org/rulebook/rules.aspx?Section=4&RuleID=RULE%202-3 (last visited Aug. 13, 2018) ("No Member or Associate shall share, directly or indirectly, in the profits or losses accruing from commodity futures trading in any account of a customer carried by the Member, or another Member, unless the customer's prior written authorization therefor is obtained."). Nor did Perkins inform Carter that it was against Straits Financial's policies and industry rules to open a discretionary account without written authorization. See National Futures Association, Rule 2-8(a), https://www.nfa.futures.org/rulebook/rules.aspx?Section=4&RuleID=RULE%202-8 (last visited Aug. 13, 2018) ("No Member or Associate shall exercise discretion over a customer's commodity futures account unless the customer or account controller has authorized the Member or Associate, in writing (by power of attorney or other instrument) to exercise such discretion."). Perkins also did not disclose these undocumented aspects of the new account to Straits Financial. At trial, Perkins admitted these policy and rule violations.

Case: 1:12-cv-06610 Document #: 181-1 Filed: 10/09/18 Page 18 of 42 PageID #:3648
Case: 1:12-cv-06610 Document #: 173 Filed: 09/21/18 Page 18 of 31 PageID #:3597
Case: 16-3860      Document: 00713289379      Filed: 09/20/2018      Pages: 31

a few days, Perkins began trading in what the parties call the
"35 Account."

B. *"We Kinda Have a Problem"*

One might guess what happened next. After sustaining
some initial setbacks from trading various commodities fu-
tures contracts, in early 2012 Perkins turned his speculative
attention to Treasury Bond futures, and accumulated several
hundred thousand dollars in profits. By mid-March, the net
profit from Perkins's Treasury Bond trading in the 35 Account
reached $300,000. On March 16 Perkins called Carter to share
the good news. Carter instructed Perkins to "send [the
$300,000] to me," and "I will send you your half back," which
Carter later did by mailing Perkins a $150,000 check. Carter
then told his broker, "close it out, don't do anything more …
Shut it down and don't do anything more."[3]

But Perkins did more. On twenty different days between
March 16 and June 4, Perkins executed trades in the 35 Ac-
count, wagering hundreds of thousands of dollars on Treas-
ury Bond futures even though the two accounts were nomi-
nally for livestock hedging and "Record Keeping Purposes."
By mid-June, and without Carter's actual knowledge of them,
the losses in the 35 Account exceeded $2 million. Carter did
not realize there was a problem in his Straits Financial ac-
counts until he tried to cash out a sizable position in the 33
Account and received no response. Carter finally got Perkins
on the phone around June 20. Perkins admitted: "we kinda
have a problem … they're holding your account money in

---

[3] Though Perkins later disputed receiving these instructions, on this
critical point the district judge sided with Carter, finding his testimony
credible. Dkt. 83 at 4.

Case: 1:12-cv-06110 Document #: 181-1 Filed: 10/09/18 Page 19 of 42 PageID #:3649
Case: 1:12-cv-06110 Document #: 173 Filed: 09/21/18 Page 8 of 31 PageID #:3596
Case: 16-3860    Document: 00713289379    Filed: 09/20/2018    Pages: 31

your livestock account to clear this up," with "this" being the $2 million shortfall in the 35 Account for "record-keeping."

Besides the fact that broker Perkins did not tell him about the losses, the record discloses at least two other reasons why Carter did not realize there was a problem until June 20. The first had to do with Straits Financial's margin policies. Because the two related accounts were being cross-margined, Ten Sleep's deposits into the 33 Account masked the problems developing in the 35 Account.[4] This meant that while Carter wired well over a million dollars into his hedging account at Straits Financial between March and June 2012 in response to Perkins's requests, Carter did not know that these cash infusions into the 33 Account actually served to stave off the closure of both accounts as Perkins's trades kept digging the 35 Account into a deeper hole. Nor did Carter realize that the statements being sent to him covered not just the expected activity in the 33 Account but also the unexpected problems in the 35 Account.

The second reason why Carter failed to realize what was happening in the 35 Account was bovine. Although Straits Financial mailed him statements every month and after every trade was made, between March and May Carter spent all of his waking hours in Manderson, Wyoming, 40 miles away from Ten Sleep, because it was calving season. Between May

---

[4] Cross-margining refers to the practice of counting the excess margin in one account toward the margin requirements in another account that has fallen below the margin requirements. See *In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litig.*, 586 F. Supp. 2d 172, 188 & n.22 (S.D.N.Y. 2008) (explaining language in a trade confirmation form that dealt with "cross-margining").

Case: 1:12-cv-06510 Document #: 181-1 Filed: 10/09/18 Page 20 of 42 PageID #:3650
Case: 1:12-cv-06510 Document #: 181-1 Filed: 09/21/18 Page 2 of 31 PageID #:3550
Case: 16-3860     Document: 00713289379     Filed: 09/20/2018     Pages: 31

and June, Carter was busy driving his cattle 240 miles to pasture in Rawlins, Wyoming. During this period, Perkins used Carter's unavailability as a stalling tactic with his Chicago-based bosses at Straits Financial, claiming Carter "is supposed to be calling me back" about the margin calls and assuring his superiors, "Don't worry we will be fine. [Carter] is just moving some stuff around in the fields."

Once Perkins came clean to Carter about the losses, the two agreed to meet at Carter's lawyer's office in Casper, Wyoming to discuss the problem and the fact that Straits Financial had moved to offset the shortfall in the 35 Account by seizing and liquidating the 33 Account. At the meeting, Carter explained that he thought the 35 Account was "supposed to zero out" and that Straits Financial should send him "100 percent of the money that was in the 33 account." Perkins responded: "that will not happen and can't happen." After several hours of discussion, Perkins signed an affidavit in which he admitted that he conducted "account activity on numerous occasions without consulting" Carter. Dkt. 6–2 at 2.[5] After returning home, Perkins retained counsel, resigned from Straits Financial, and moved his brokerage to yet another firm.

C. *The Litigation*

In late June 2012, the combined balance of Carter's accounts had finally gone negative. Straits Financial liquidated the positions worth $1,823,168.77 in the 33 Account and applied them to the $1,992,045.79 deficiency in the 35 Account. This left a debit balance of $168,877.02, which Straits Financial

---

[5] Perkins did not dispute that part's accuracy when asked about the affidavit at trial, and the district court relied on the admissions in the affidavit.

Case: 1:12-cv-06410 Document #: 181-1 Filed: 10/29/18 Page 21 of 42 PageID #:3651
Case: 1:12-cv-06410 Document #: 175 Filed: 09/21/18 Page 101 of 31 PageID #:3893
Case: 16-3860     Document: 00713289379     Filed: 09/20/2018     Pages: 31

sought to recover from Ten Sleep and Carter by filing this case, originally in an Illinois state court. Carter removed the case to the Northern District of Illinois based on diversity of citizenship, answered the complaint, and filed a counterclaim against Straits and a third-party complaint against Perkins. Carter alleged that the seizure of his 33 Account funds by Straits Financial amounted to conversion; that Straits Financial and Perkins were unjustly enriched, breached fiduciary duties, committed commodities fraud, and violated the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA); and that Straits Financial negligently supervised Perkins. The case proceeded to a bench trial in September 2014.

Carter prevailed on most of the points disputed at trial. Judge Zagel found that Perkins had defrauded him, that Straits Financial was vicariously liable for that fraud and for an ICFA violation, and that Carter also had proven unjust enrichment and conversion. Quoting *Grundstad v. Ritt*, 166 F.3d 867, 870 (7th Cir. 1999), the judge rejected Straits Financial's argument that the RJO agreement and its associated personal guarantee applied to the losses in the 35 Account. Because Straits Financial "failed to clearly and specifically communicate to Ten Sleep which agreements and contracts were being assigned," the attempted assignment was invalid, and Straits Financial could not enforce the personal guarantee. Because Ten Sleep had prevailed on its ICFA claim, and because that statute permits the court to award "reasonable attorney's fees and costs to the prevailing party," 815 Ill. Comp. Stat. Ann. 505/10a(c), the judge also ordered Straits Financial to pay Ten Sleep's attorney fees.

However, the court agreed with Straits Financial's argument that by neglecting its account statements, Ten Sleep had

Case: 1:12-cv-06110 Document #: 181-1 Filed: 10/29/18 Page 22 of 42 PageID #:3652
Case: 1:12-cv-06110 Document #: 175 Filed: 09/21/18 Page 12 of 31 PageID #:3605
Case: 16-3860      Document: 00713289379      Filed: 09/20/2018      Pages: 31

failed to mitigate its damages through the exercise of "reasonable diligence and ordinary care," an expectation the court found to be imposed by Illinois law. The court reduced Ten Sleep's damages recovery "by the proportion of responsibility" Carter bore by not noticing Perkins's fraud earlier. In addition, the court rejected Ten Sleep's request for punitive damages.

After further briefing, the district court determined that Carter should be held responsible for losses accrued in the 35 Account between June 11 and 20, because of his failure to read and act on "dozens of communications from Straits including 23 letters" and statements related to the account. This reduced Ten Sleep's recovery from $2,206,754.80 to $1,457,601.50, though the district court did grant prejudgment interest on the eventual damages award. See Dkts. 99, 111, 113. After still more briefing and reassignment of the case to Judge Shah, the court awarded attorney fees and costs, finding the attorneys' work on Ten Sleep's ICFA claim "inextricably intertwined" with the other claims presented. *Straits Financial LLC v. Ten Sleep Cattle Co.*, No. 12 CV 6110, 2017 WL 5900280, at *1 (N.D. Ill. May 2, 2017).

Both sides have appealed. In the end, we agree with Carter and Ten Sleep on all three of the disputed issues. We affirm all of the district court's conclusions regarding Straits Financial's liability and the fee award, but we reverse the portion of its judgment requiring mitigation of damages. We remand for recalculation of Ten Sleep's damages.

Case: 1:12-cv-06410 Document #: 181-1 Filed: 10/09/18 Page 23 of 42 PageID #:3653
Case: 1:12-cv-06410 Document #: 175 Filed: 09/21/18 Page 123 of 31 PageID #:3600
Case: 16-3860       Document: 00713289379       Filed: 09/20/2018       Pages: 31

II. *Analysis*

A.  *Standard of Review*

Coming on the heels of a seven-day bench trial, the arguments and issues in this appeal defy easy labels. In most cases it is enough to repeat the usual refrain: "We review the district court's findings of fact for clear error, and review its conclusions of law de novo." *Frentz v. Brown*, 876 F.3d 285, 293 (7th Cir. 2017), citing *In re Rovell*, 194 F.3d 867, 870 (7th Cir. 1999). That usual statement is not quite adequate in this case. Here we have one issue for which the standard of review is straightforward—the decision to grant attorney fees under the ICFA is reviewable only for an abuse of discretion. *Krautsack v. Anderson*, 861 N.E.2d 633, 643–44 (Ill. 2006) ("Because section 10a(c) [of the ICFA] states that the court 'may' award attorney fees and costs, and the word 'may' ordinarily connotes discretion, attorney fee awards are left to the sound discretion of the trial court.") (citations omitted); see also *Pickett v. Sheridan Health Care Center*, 664 F.3d 632, 639 (7th Cir. 2011) ("We review the award of attorneys' fees for abuse of discretion" unless "the district court denies a fee award based on a legal principle") (citations omitted).

The other issues in these appeals are "mixed question[s] of fact and law," which is not necessarily a helpful label. See *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 625 (7th Cir. 2010); see also *U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Management LLC v. Village at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018) ("Mixed questions are not all alike."). Our general task on such questions "is to determine the legal significance of a set of facts" found by the district court, which entails significant deference to the district court's conclusions when those

Case: 1:12-cv-06110 Document #: 181-1 Filed: 10/29/18 Page 24 of 42 PageID #:3654
Case: 1:12-cv-06110 Document #: 175 Filed: 09/21/18 Page 14 of 31 PageID #:3601
Case: 16-3860    Document: 00713289379    Filed: 09/20/2018    Pages: 31

conclusions are confined to the specific context of the case pre-sented. *Text Messaging Antitrust Litig.*, 630 F.3d at 625 (distin-guishing the "application of a legal standard to a unique, non-recurring set of particular facts").

For the most part, that is the approach we take here, ana-lyzing the district court's conclusions of mixed questions for clear error. See *Trovare Capital Group, LLC v. Simkins Industries, Inc.*, 794 F.3d 772, 778 (7th Cir. 2015) ("We review mixed ques-tions of fact and law (that do not involve constitutional rights) for clear error."), citing *Levenstein v. Salafsky*, 414 F.3d 767, 773 (7th Cir. 2005). But that deference ends when the district court ventures beyond "case-specific factual issues" and reaches broader legal conclusions applicable to a whole class of future cases. *Village at Lakeridge*, 138 S. Ct. at 967. In such situations the Supreme Court reminds us that it is an appellate function to "expound on the law, particularly by amplifying or elabo-rating on a broad legal standard" and to develop "auxiliary legal principles of use in other cases." *Id*. We therefore apply a clear-error standard of review in this case, taking care not to defer to the district court's judgment where it effectively an-nounced new legal rules that would govern future cases.

### B. *Issues Presented*

Straits Financial appeals the district court's findings on li-ability, but it does not challenge the district court's most basic findings: that Perkins committed fraud, for which Straits Fi-nancial is vicariously liable as his employer.[6] Instead, Straits

---

[6] Perkins separately appealed from the district court's judgment, but we consolidated the appeals and Perkins has adopted all of Straits Finan-cial's arguments as his own. This opinion resolves all the issues presented in all of the consolidated appeals.

Case: 1:12-cv-06410 Document #: 181-1 Filed: 10/29/18 Page 25 of 42 PageID #:3655
Case: 1:12-cv-06410 Document #: 175 Filed: 09/21/18 Page 25 of 31 PageID #:3602
Case: 16-3860    Document: 00713289379    Filed: 09/20/2018    Pages: 31

Financial argues that the district court erred by not ruling in its favor on several contract-based defenses that in its view should establish its right to liquidate the 33 Account and to recover the debit balance from Ten Sleep, as well as negate its liability for conversion and unjust enrichment. In this vein, Straits Financial first argues that the original RJO agreement and personal guarantee for the 33 Account should be extended to cover the losses in the 35 Account. If those terms, conditions, and guarantees apply through any one of several theories, then Carter and Ten Sleep are legally responsible for the 35 Account losses, and Straits Financial acted appropriately in pursuing them for those losses. We treat this as a mixed question of fact and law that involves interpreting the legal significance of a unique series of transfers, notices, agreements, and events that established Ten Sleep's relationship with Straits Financial.

Second, Straits Financial argues that the ICFA attorney fee award should be reduced. Its theory is that the work performed for Ten Sleep's ICFA claim was separable from attorney work on its other statutory and common-law claims. The district court's judgment on this question is reviewed for an abuse of discretion, as explained above.

Both Straits Financial and Ten Sleep (via a cross-appeal) challenge the district court's decision on mitigation of damages. Straits Financial challenges the district court's selection of June 11 as the date from which Carter's damages should have been mitigated under Illinois law, arguing that the proper date should be April 5. Ten Sleep contends that no mitigation was required and that the district court erred by applying comparative negligence principles in a fraud case. As an application of a legal standard to a particular set of facts,

Case: 1:12-cv-06410 Document #: 181-1 Filed: 10/29/18 Page 26 of 42 PageID #:3656
Case: 1:12-cv-06410 Document #: 175 Filed: 09/21/18 Page 26 of 31 PageID #:3603
Case: 16-3860     Document: 00713289379     Filed: 09/20/2018     Pages: 31

this too is a mixed question of fact and law, but it has legal repercussions well beyond the facts of this particular case.

These are all issues of Illinois state law. We apply the relevant decisions of the Illinois Supreme Court, and if a question of law has not yet been decided by that court, we are to make a "prediction of how the Supreme Court of Illinois would rule" on it, using decisions of the state's intermediate appellate courts for guidance as necessary. *Community Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803, 811–12 (7th Cir. 2018), quoting *Taco Bell Corp. v. Continental Cas. Co.*, 388 F.3d 1069, 1077 (7th Cir. 2004).

### C. *The Rules Governing the 35 Account*

Straits Financial contends that the terms, conditions, and guarantees that constitute the 33 Account's original RJO agreement apply to both the 33 Account and new 35 Account at Straits. It points out that the RJO agreement specifically envisioned the possibility that the 33 Account could be moved to another financial institution, that the assignment of the agreement from RJO to Straits Financial is valid under Illinois law, and that Carter has admitted that Straits Financial sent the negative consent letter called for in federal regulations. See 17 C.F.R. § 1.65(a)(2) (requirements for "bulk transfers" of commodity accounts). Straits Financial argues further that the 33 Account's "terms and conditions" are the only ones that it and Ten Sleep could have adopted by reference through the boilerplate language in the Related Account Authorization form. Thus, Straits Financial concludes, the district court was wrong when it reasoned that the authorization form was "so opaque as to be unenforceable" against Ten Sleep. To what other terms and conditions could Carter have been assenting?

Case: 1:12-cv-06410 Document #: 181-1 Filed: 10/29/18 Page 27 of 42 PageID #:3657
Case: 1:12-cv-06410 Document #: 175 Filed: 09/21/18 Page 167 of 312 PageID #:3804
Case: 16-3860      Document: 00713289379      Filed: 09/20/2018      Pages: 31

On the surface this seems like a strong argument. Illinois courts will enforce an assignment even if the "party whose obligations were assigned" did not receive notice of the transaction, absent exceptions not relevant here. See *Grunloh v. Effingham Equity, Inc.*, 528 N.E.2d 1031, 1039 (Ill. App. 1988). Incorporation by reference is also permitted. See *Wright v. Mr. Quick, Inc.*, 486 N.E.2d 908, 910 (Ill. 1985), citing *Provident Federal Savings & Loan Ass'n v. Realty Centre, Ltd.*, 454 N.E.2d 249, 251 (Ill. 1983). To be enforceable, an Illinois contract need be only "sufficiently definite and certain" that a court may "ascertain what the parties have agreed to do," *Reese v. Forsythe Mergers Group, Inc.*, 682 N.E.2d 208, 214 (Ill. App. 1997), quoting *Academy Chicago Publishers v. Cheever*, 578 N.E.2d 981, 983 (Ill. 1991), which in this case was simple: open the 35 Account under the same standard rules, terms, and conditions as the 33 Account. We agree with Straits Financial to the extent that there must have been *some* rules that governed the 35 Account, and the authorization form shows an intent to make the RJO agreement's standard account formation terms like the forum selection clause and the electronic signature provisions apply to both accounts.

Straits Financial's argument runs aground, however, on a different point highlighted by the district court: how Illinois courts interpret guarantees. To have allowed Straits Financial to confiscate the property in the 33 Account, one of two theories must be correct. Either Carter's personal guarantee of "all sums owed to RJO … now existing or … hereafter created" under the 33 Account agreement must also have applied to guarantee losses in the 35 Account, or the RJO agreement's

Case: 1:12-cv-06410 Document #: 181-1 Filed: 10/29/18 Page 28 of 42 PageID #:3658
Case: 1:12-cv-06410 Document #: 175 Filed: 09/21/18 Page 178 of 31 PageID #:3605
Case: 16-3860     Document: 00713289379     Filed: 09/20/2018     Pages: 31

short section on debit balances and offsets, which briefly re-fers to a "Customer's obligations," must have served that same promissory function for the 35 Account.[7]

Yet guarantees are construed strictly in Illinois, meaning that "the scope of a guarantor's liability extends no further than that which the guarantor has agreed to accept." *Southern*

---

[7] The personal guarantee attached to the 33 Account's RJO agreement reads in relevant part:

> The undersigned (jointly and severally if there is more than one) hereby unconditionally and irrevocably guar-antees full and prompt payment to RJO of all sums owed to RJO by Customer pursuant to the [foregoing] Account Agreement, whether such sums are now existing or are hereafter created. …

> All monies, securities, … or other property belonging to the undersigned now or at any future time that are on de-posit with RJO, for any purpose, are hereby pledged to RJO for discharge of all of the undersigned's obligations hereunder, and RJO may, in its discretion, transfer any of such property from any of the undersigned's accounts to RJO to offset and credit against any of the undersigned's obligations to RJO under this Guarantee.

Dkt. 153–1 at 22. The debit balances section of the 33 Account's RJO agree-ment reads in relevant part:

> All monies, securities, … or other property now or at any future time on deposit or in safekeeping with RJO, shall constitute security for Customer's obligations hereunder and Customer grants RJO the right to sell or use such se-curity to offset and credit any of those obligations not promptly paid. Customer understands that Customer is liable to RJO for any deficit ("debit") balance in the ac-count(s) remaining after any such offset.

*Id.* at 13 ¶ 5.

Case: 1:12-cv-06110 Document #: 181-1 Filed: 10/29/18 Page 29 of 42 PageID #:3659
Case: 1:12-cv-06110 Document #: 175-1 Filed: 09/21/18 Page 189 of 312 PageID #:3605
Case: 16-3860      Document: 00713289379      Filed: 09/20/2018      Pages: 31

*Wine & Spirits of Illinois, Inc. v. Steiner*, 8 N.E.3d 1065, 1069 (Ill. App. 2014), citing *Riley Acquisitions, Inc. v. Drexler*, 946 N.E.2d 957, 965–66 (Ill. App. 2011). "A guarantor has acquired status as a favorite of the law, and when construing liability the court accords the guarantor the benefit of any doubts that may arise from the language of the contract." *Southern Wine & Spirits of Illinois*, 8 N.E.3d at 1069, citing *Schiff v. Continental Nat'l Bank & Trust Co. of Chicago*, 255 Ill. App. 333, 340 (1930). In addition, even where a guarantee's terms may apply after an assignment, a guarantor is discharged from liability if there is "a material change in the business dealings" between the parties "and some increase in the risk undertaken by the guarantor." See *Southern Wine & Spirits of Illinois*, 8 N.E.3d at 1070, citing *Harris Trust & Savings Bank v. Stephans*, 422 N.E.2d 1136, 1139 (Ill. App. 1981); see also *Grundstad v. Ritt*, 166 F.3d 867, 870 (7th Cir. 1999). In the words of the district court, "Illinois courts look to 'whether there has been a material change in risk to the guarantor.'" Dkt. 83 at 9, quoting *Grundstad*, 166 F.3d at 870.

There certainly was a material change in business dealings and Ten Sleep's risks here. What began as a non-discretionary trading relationship designed to secure livestock price certainty for Ten Sleep turned into unauthorized and unrestrained speculation on Treasury Bond futures at the sole discretion of Straits Financial's employee, who defrauded Ten Sleep. The 35 Account was neither the same kind of business relationship nor, once the unauthorized trading began, did it present the same risks to Ten Sleep and Carter as the 33 Account. It was also not set up through clear and unambiguous contracts that would indicate Carter and Ten Sleep's willingness to be held responsible for Perkins's fraud (assuming such terms would even be enforced). Holding either Carter or Ten

Case: 1:12-cv-06410 Document #: 181-1 Filed: 10/29/18 Page 30 of 42 PageID #:3660
Case: 1:12-cv-06410 Document #: 175 Filed: 09/21/18 Page 19 of 31 PageID #:3607
Case: 16-3860     Document: 00713289379     Filed: 09/20/2018     Pages: 31

Nos. 16-3860, 16-3903, 16-3967 & 17-2100                19

Sleep liable for those losses would stretch the boilerplate of the personal guarantee and the RJO agreement much further than Illinois law on guarantees permits. As Illinois courts have repeatedly said: "A guarantor's liability is not to be varied or extended beyond the terms of the guaranty." *Roels v. Drew Industries, Inc.*, 608 N.E.2d 411, 415 (Ill. App. 1992) (citations omitted).

Straits Financial also argues that by not immediately objecting to the unauthorized trades Perkins made, Ten Sleep ratified those trades and must be held financially responsible for them. This is an offshoot of Straits Financial's argument that the RJO agreement applies, since paragraph 11 of the RJO agreement provided:

> Unless a managed (discretionary) account has been arranged through the execution of a written trading authorization, each order should be communicated to RJO by the Customer or Customer's duly authorized broker. Instructions should include, but may not necessarily be limited to, the commodity involved, quantity, price, and delivery month. *Any trade not specifically authorized by Customer must be immediately reported by Customer directly to RJO's Compliance Department. Customer will be financially responsible for all trades not so reported and for any losses arising by virtue of a course of dealing involving his grant of de facto control over the account to his broker.*

Case: 1:12-cv-06410 Document #: 181-1 Filed: 10/29/18 Page 31 of 42 PageID #:3661
Case: 1:12-cv-06410 Document #: 175 Filed: 09/21/18 Page 20 of 31 PageID #:3608
Case: 16-3860     Document: 00713289379     Filed: 09/20/2018     Pages: 31

Dkt. 153–1 at 14 (emphasis added). The RJO agreement provided further that a customer's failure to respond immediately would be considered a ratification of all account activity.[8]

Straits Financial's ratification argument fails under Illinois law for several reasons. First, deeming Carter's silence during the April–June period as consent to fraud would amount to yet another way of applying the 33 Account's personal guarantee to relieve Straits Financial and Perkins of liability for proven fraud.

Second, though Illinois permits "particular definitions" of contract terms to supersede the "generally accepted meaning" of the words used, see *Continental Casualty Co. v. Donald T. Bertucci, Ltd.*, 926 N.E.2d 833, 839 (Ill. App. 2010), citing *Sims v. Allstate Ins. Co.*, 851 N.E.2d 701, 704 (Ill. App. 2006), regardless of the particular definition of "ratification" used here, Illinois law allows contracting parties relief from fraudulent transactions as long as the fraud victim disavows the transaction "promptly after learning of the fraud." *Freedberg v. Ohio Nat'l Ins. Co.*, 975 N.E.2d 1189, 1197 (Ill. App. 2012) ("One seeking to rescind a transaction on the ground of fraud or misrepresentation must elect to do so promptly after learning of

---

[8] Regarding this duty to report problems immediately, paragraph 12 of the RJO agreement provided:

> IN THE EVENT THAT CUSTOMER DOES NOT RESPOND IMMEDIATELY, EXECUTED ORDERS AND STATEMENT REPORTS SHALL BE CONSIDERED RATIFIED BY CUSTOMER AND SHALL RELIEVE RJO OF ANY RESPONSIBILITY WHATSOEVER RELATIVE TO THE ORDER(S) IN QUESTION.

Dkt. 153–1 at 15.

Case: 1:12-cv-06410 Document #: 181-1 Filed: 10/29/18 Page 32 of 42 PageID #:3662
Case: 1:12-cv-06410 Document #: 175 Filed: 09/21/18 Page 32 of 31 PageID #:3600

Case: 16-3860      Document: 00713289379      Filed: 09/20/2018      Pages: 31

the fraud or misrepresentation, must announce his purpose and must adhere to it."), quoting *Mollihan v. Stephany*, 340 N.E.2d 627, 629 (Ill. App. 1975); *Kanter v. Ksander*, 176 N.E. 289, 291 (Ill. 1931) (same).

Immediately upon learning of this fraud, Carter maintained that the 35 Account was "supposed to zero out" on March 16 and that Straits Financial had to send him "100 percent of the money that was in the 33 account" when it was seized. Dkt. 146 at 637; see also Dkt. 6 at 13 (alleging conversion and demanding "immediate possession of the assets" taken). Carter had the right to seek this refund since "a party may exercise a right to rescind for fraud as to part of the contract" when valid business dealings can be severed from fraudulent activity. See *Olson v. Eulette*, 74 N.E.2d 609, 613 (Ill. App. 1947); see also *Keeshin v. Levin*, 334 N.E.2d 898, 906 (Ill. App. 1975). Here, Perkins's fraudulent activity after March 16 in the 35 Account is easily divisible from the legitimate accounts and trades authorized by Ten Sleep.

Finally, Illinois courts have rejected strict formalism when asked to excuse fraud. They are loathe to reach "a result … contrary to the established principle that a party committing fraud should be precluded from benefiting therefrom." *Shanahan v. Schindler*, 379 N.E.2d 1307, 1316 (Ill. App. 1978), citing *Bell v. Felt*, 102 Ill. App. 218 (1902). So are we.

Under basic contract principles, Carter did not have an obligation to repudiate Perkins's trades until he had actual knowledge of them. See Restatement (Third) of Agency § 4.06 (2006) ("A person is not bound by a ratification made without knowledge of material facts"); see also *Clews v. Jamieson*, 182 U.S. 461, 483 (1901) (noting the "well known" principle that a principal's ratification comes "within a reasonable time after

Case: 1:12-cv-06410 Document #: 181-1 Filed: 10/29/18 Page 33 of 42 PageID #:3663
Case: 1:12-cv-06410 Document #: 175 Filed: 09/21/18 Page 23 of 31 PageID #:3600
Case: 16-3860      Document: 00713289379      Filed: 09/20/2018      Pages: 31

the fact has come to his knowledge"); *Eastern Trading Co. v. Refco, Inc.*, 229 F.3d 617, 625 (7th Cir. 2000) (ratification occurs "by failing to repudiate [trades] upon discovery of them"); *Stathis v. Geldermann, Inc.*, 692 N.E.2d 798, 808 (Ill. App. 1998) ("full knowledge of the act" needed), citing *Peskin v. Deutsch*, 479 N.E.2d 1034, 1039 (Ill. App. 1985). Carter objected immediately upon discovering the fraud—he did not acquiesce to it. The RJO agreement does not change that conclusion.[9]

Also, Straits Financial's legal theory relies too heavily on a suggestion we made in a footnote in *Anspacher & Associates, Inc. v. Henderson*, 854 F.2d 941 (7th Cir. 1988). That opinion's footnote 2 hypothesized that "the terms of a signed customer agreement" requiring prompt action by the customer to dispute transactions "could … bar a commodities customer from recovering damages for his broker's fraud" under Illinois law. *Id.* at 947 n.2. For this possibility under Illinois law, though, *Anspacher* cited an Arizona case where a customer noticed and

---

[9] One decision of the Illinois Appellate Court took a slightly different view: "although normally a principal's actual knowledge of the transaction is essential, 'one whose ignorance or mistake was the result of gross or culpable negligence in failing to learn the facts will be estopped as if he had full knowledge of the facts.'" *Progress Printing Corp. v. Jane Byrne Political Committee*, 601 N.E.2d 1055, 1067–68 (Ill. App. 1992), quoting 18 Ill. Law & Prac. *Estoppel* § 23 at 84 (1956). But *Progress Printing* was not a case about fraud. It affirmed a "finding of ratification where a political committee did not fully pay for printed campaign materials that it had accepted and used." *Coyne v. Claypool*, No. 1–16–0061, 2016 WL 7429443 at *10 (Ill. App. Dec. 23, 2016) (summarizing *Progress Printing*). This case is markedly different. Carter did not have knowledge of the trades when they were made, nor did he ratify them "by accepting the benefits of those acts" later. See *Kulchawik v. Durabla Mfg. Co.*, 864 N.E.2d 744, 750 (Ill. App. 2007), citing *City of Burbank v. Illinois State Labor Relations Bd.*, 541 N.E.2d 1259, 1264 (Ill. App. 1989).

Case: 1:12-cv-06410 Document #: 185-1 Filed: 10/29/18 Page 34 of 42 PageID #:3664
Case: 1:12-cv-06410 Document #: 175 Filed: 09/21/18 Page 23 of 31 PageID #:3631
Case: 16-3860     Document: 00713289379     Filed: 09/20/2018     Pages: 31

was irritated by (but did not formally object in writing to) un-authorized transactions occurring repeatedly over a period of several years. *Id.*, citing *Shapiro v. Bache & Co., Inc.*, 569 P.2d 267, 270–71 (Ariz. App. 1977). Indeed, *Shapiro* reads like a case about an investor whose equivocal complaints about unauthorized transactions bordered on bad faith. As the *Shapiro* court explained, despite these purportedly unauthorized transactions:

> Shapiro continued to execute transactions through his registered representatives, and to accept repeated notifications of the transactions in question and to pay margin calls on demand, all of which conduct continued for *more than three years* from the time of the first unauthorized transaction.

569 P.2d at 271 (emphasis added).

Nothing remotely like the facts in *Shapiro* happened here. Unlike the customer in *Anspacher* itself, Carter was not "waiting to see the results of those [unauthorized] trades" before expressing his concern. 854 F.2d at 942. Carter did not actually know about these trades until it was too late. When he found out, he immediately set up a meeting with Perkins. Finding Carter or Ten Sleep responsible for losses resulting from Perkins's proven fraud would in essence apply a guarantee or ratification that was never given. We affirm the district court's rejection of Straits Financial's defenses based on the RJO agreement.[10]

---

[10] Straits Financial makes an estoppel argument as well, claiming that "Straits was lulled into a false sense of security that Ten Sleep had agreed that its RJO Agreement continued to govern" the relationship. This is not

Case: 1:12-cv-06410 Document #: 181-1 Filed: 10/09/18 Page 35 of 42 PageID #:3665
Case: 1:12-cv-06410 Document #: 175 Filed: 09/21/18 Page 25 of 31 PageID #:3632
Case: 16-3860      Document: 00713289379      Filed: 09/20/2018      Pages: 31

24                          Nos. 16-3860, 16-3903, 16-3967 & 17-2100

### D. *The ICFA Attorney Fee Award*

We also agree with the district court, Ten Sleep, and Carter regarding the attorney fee award under the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA or Act). The ICFA permits trial courts to award fees to the prevailing party as a matter of discretion. 815 Ill. Comp. Stat. Ann. 505/10a(c); *Ciampi v. Ogden Chrysler Plymouth, Inc.*, 634 N.E.2d 448, 462–63 (Ill. App. 1994). Illinois courts have interpreted this fee provision to allow fee awards for work on an ICFA claim and "for work on non-Act claims when the Act claim is so inextricably intertwined with the non-Act claims that it cannot be distinguished." *Dubey v. Public Storage, Inc.*, 918 N.E.2d 265, 283 (Ill. App. 2009), citing *Ardt v. State*, 687 N.E.2d 126, 131–32 (Ill. App. 1997) (discussing case that "arose from a common core of facts"). *Dubey* also explained what Illinois courts mean by inextricably intertwined: "Here, we find that the conversion and breach of contract claims were [1] based on the same evidence and [2] the time spent on each issue could not be distinguished." *Id.*, citing *Ciampi*, 634 N.E.2d at 463. But it is not the case that "all counts in a consumer action tried together are compensable"—the party seeking fees must do more than show that "some of the evidence was the same." *Schorsch v. Fireside Chrysler-Plymouth, Mazda, Inc.*, 677 N.E.2d 976, 979 (Ill. App. 1997).

---

a reason to hold Ten Sleep or Carter liable for something Ten Sleep did not do. As explained above, the most basic terms governing the Straits-Ten Sleep relationship were supplied by the stock terms of the 33 Account's RJO agreement. But as also explained above, Illinois law does not permit the guarantees, obligations, or immediate ratification language pertaining to that account to be applied silently to a very different later relationship with a higher risk to the customer-guarantor.

Case: 1:12-cv-06110 Document #: 181-1 Filed: 10/29/18 Page 36 of 42 PageID #:3666
Case: 1:12-cv-06110 Document #: 175 Filed: 09/21/18 Page 36 of 31 PageID #:3613
Case: 16-3860    Document: 00713289379    Filed: 09/20/2018    Pages: 31

The district court did not abuse its discretion in awarding Ten Sleep fees for "the work reasonably performed on all of Ten Sleep's claims and defenses." *Straits Financial LLC v. Ten Sleep Cattle Co.*, No. 12 CV 6110, 2017 WL 5900280, at \*2 (N.D. Ill. May 2, 2017). Among other elements, ICFA plaintiffs must prove a "deceptive act or practice by the defendant," must prove that the defendant intended for the plaintiff to rely on that deception, and must also prove that the deception proximately caused the plaintiff's damages. *De Bouse v. Bayer*, 922 N.E.2d 309, 313 (Ill. 2009). This need to prove deception, intent, causation, and damages, and to defend these theories from legal counter-attack, meant that Ten Sleep had to uncover and present volumes of facts and arguments about Perkins's unauthorized trading and the relationships among Carter, Perkins, and Straits Financial. The details of the account formation, the unauthorized trading, and its consequences formed the common core of all theories in this case. As Judge Shah correctly observed: "Facts tending to prove fraudulent or deceptive activity were woven throughout this case and the work done to develop those facts and theories cannot be neatly separated by claim." *Straits Financial*, 2017 WL 5900280, at \*2.[11]

### E.  *Mitigation of Damages on the Fraud Claims*

#### 1.  *The Parties' Arguments*

In their cross-appeal, Carter and Ten Sleep ask us to overturn the district court's judgment that they failed to mitigate their damages by "neglecting communications … and never

---

[11] Counsel for Ten Sleep subtracted time for work demonstrably unrelated to ICFA issues, such as the work on an unsuccessful jurisdictional motion to dismiss.

Case: 1:12-cv-06410 Document #: 181-1 Filed: 10/29/18 Page 37 of 42 PageID #:3667
Case: 1:12-cv-06410 Document #: 175 Filed: 09/21/18 Page 26 of 31 PageID #:3624
Case: 16-3860     Document: 00713289379     Filed: 09/20/2018     Pages: 31

inquiring about suspicious circumstances," including the fact that Carter "did not know what document … govern[ed] his relationship with Straits." Dkt. 83 at 10.  The district court found that Carter should have discovered and put a stop to Perkins's fraud before June 20, 2012 by reading the mailed trading confirmations and asking about the status of the 35 Account. Judge Zagel found this amounted to a failure to exercise reasonable diligence and ordinary care under general principles of Illinois contract law. *Id.*, citing *Ner Tamid Congregation of North Town v. Krivoruchko*, 638 F. Supp. 2d 913, 919–20 (N.D. Ill. 2009); see also *Nancy's Home of the Stuffed Pizza, Inc. v. Cirrincione*, 494 N.E.2d 795, 800 (Ill. App. 1986) (in general, a "party being damaged cannot stand idly by and allow the injury to continue and increase without making reasonable efforts to avoid further loss"), citing *Jensen v. Chicago & Western Indiana R.R. Co.*, 419 N.E.2d 578, 591 (Ill. App. 1981).

Accordingly, the district court decided to reduce Ten Sleep's damages to those incurred as of the June 11, 2012 trading day, an "earlier date" by which Perkins's unauthorized trading "could and should have been discovered." This resulted in a $749,153.30 reduction in Ten Sleep's damages, from approximately $2.21 million to around $1.46 million. Ten Sleep contests this conclusion and the resulting reduction in damages, arguing that the district court should not have applied duties and principles for ordinary contract or comparative negligence cases to reduce the recovery of a victim of intentional fraud. It argues further that no mitigation was possible until Carter learned the real facts of the fraud on June 20, at which point he took action immediately. For its part, Straits Financial asks us to affirm the district court's legal analysis, but to choose a much earlier starting date for the duty of mitigation: April 5, which would cut damages sharply.

Case: 1:12-cv-06410 Document #: 181-1 Filed: 10/29/18 Page 38 of 42 PageID #:3668
Case: 1:12-cv-06410 Document #: 175 Filed: 09/21/18 Page 29 of 31 PageID #:3616
Case: 16-3860    Document: 00713289379    Filed: 09/20/2018    Pages: 31

Judge Zagel decided in essence that inquiry notice—in the form of trading confirmations and statements piling up in Carter's mailbox during calving season—was enough to treat Carter as if he were actually aware of the fraudulent activity in Ten Sleep's account, and was also enough to hold him responsible for Perkins's later unauthorized trades. The judge then selected a date by which Carter should have had that awareness, June 11, and reduced Ten Sleep's damages to the amount it should receive if Carter had intervened then.

### 2. *Analysis*

The Solomonic character of the judge's approach to the issue is readily apparent. We find, however, that the compromise was based on a faulty legal premise. Fraud victims are not responsible for their agent's fraud before they even learn of any unauthorized activity. Illinois courts have not adopted Straits Financial's or the district court's position on this issue. Under Illinois law, the injured party must have actual knowledge of the problem before it must act to mitigate its damages. See *Continental Concrete Pipe Corp. v. Century Road Builders, Inc.*, 552 N.E.2d 1032, 1042 (Ill. App. 1990). Though *Continental Concrete Pipe* was a defective product case, its reasoning provides significant guidance here.

In *Continental Concrete Pipe*, according to the project specifications and unless it received contrary instructions, a construction company should have tested the sewer pipe it was laying after installing the first 1,200 feet of pipe. On the instructions of the local village engineer, though, the construction company delayed the pipe test until 1,800 feet had been completed. At that point, a test showed the pipe to be defective. Even though the construction company had laid an additional 600 feet of pipe before performing the required test,

Case: 1:12-cv-06410 Document #: 181-1 Filed: 10/29/18 Page 39 of 42 PageID #:3669
Case: 1:12-cv-06410 Document #: 175 Filed: 09/21/18 Page 29 of 31 PageID #:3616
Case: 16-3860     Document: 00713289379     Filed: 09/20/2018     Pages: 31

the court held it could still recover the full damages it suffered from the supplier's defective pipe. This was because, under Illinois law, "the duty to mitigate damages does not arise until the party upon whom the duty is impressed is aware of facts which make the duty to mitigate necessary." *Id.* (citation, quotation marks and brackets omitted). Because the construction company "did not become aware of any facts which made any duty to mitigate necessary" until it performed the belated test, no duty to mitigate arose before that time. *Id.*

We have reached the same conclusion in another case of fraud. The duty to mitigate damages does not arise until the injured party has actual knowledge of the injury. In other words, fraud victims are expected to take reasonable action once they are made aware of the real situation. But fraud victims will not lose the benefit of later remedies simply because better precautions on their part might have avoided the fraud or ended it sooner, which is often the case, especially with a court's benefit of hindsight. In a case about a loan from a pension fund and the fund's imprudent trustees, we said:

> Had the trustees [simply] done what any investor should have done, there would have been no loss here….
>
> But such investigations and other devices are distinctly second-best solutions to legal and practical problems, and we will not establish a legal rule under which investors must resort to the costly self-help approach of investigation on pain of losing the protection of the principal legal safeguard, the rule against fraud.

Case: 1:12-cv-06410 Document #: 181-1 Filed: 10/09/18 Page 40 of 42 PageID #:3670
Case: 1:12-cv-06410 Document #: 175-1 Filed: 09/21/18 Page 29 of 31 PageID #:3697
Case: 16-3860     Document: 00713289379     Filed: 09/20/2018     Pages: 31

> This is just another way to state the common law
> rule that contributory negligence is not a de-
> fense to an intentional or reckless tort. Prosser &
> Keeton, *The Law of Torts* 462 (5th ed. 1984); Re-
> statement (Second) of Torts §§ 481, 482 (1965).
> The best solution is for people not to harm oth-
> ers intentionally, not for potential victims to
> take elaborate precautions against such depre-
> dations.

*Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522,
527–28 (7th Cir. 1985). We did not base this rule on how elab-
orate the suggested precaution would be. Instead, we summa-
rized the relevant inquiry in two parts:

> The first question for the legal system is whether
> to create a duty to disclose information truth-
> fully. Such a duty, if created, rests on the prop-
> osition that the information ought to come out,
> and that people ought *not* be left to their own
> investigative talents. Once the duty to disclose
> exists, and lying or nondisclosure is condemned
> as an intentional tort, it no longer matters
> whether the buyer conducts an investigation
> well or at all.

*Id.* at 528; see also *Astor Chauffeured Limousine Co. v. Runnfeldt
Inv. Corp.*, 910 F.2d 1540, 1546 (7th Cir. 1990) (explaining *Team-
sters Local 282*).[12]

---

[12] Exceptions to this general rule further underscore the importance
of the injured party's actual knowledge. In *Teamsters Local 282*, we noted
that "there are some occasions when the plaintiff's 'gross conduct some-
what comparable to that of the defendant' could bar recovery." *Indosuez*

Case: 1:12-cv-06410 Document #: 181-1 Filed: 10/29/18 Page 41 of 42 PageID #:3671
Case: 1:12-cv-06410 Document #: 175-1 Filed: 09/21/18 Page 30 of 31 PageID #:3616
Case: 16-3860     Document: 00713289379     Filed: 09/20/2018     Pages: 31

Here, it is established that Perkins (and by extension, Straits Financial) had a fiduciary duty to Ten Sleep, and that he breached this duty by continuing his unauthorized trading "even after Carter instructed him to stop." Dkt. 83 at 6. Perkins breached it again "by failing to disclose this activity to Carter." *Id.* Since fraud is, of course, an intentional tort under Illinois law, we must not forget that "an action for an intentional tort cannot be defeated by an assertion of negligence on the part of the plaintiff" regardless of whether the fraud claim is brought "at law or in equity." *Mother Earth, Ltd. v. Strawberry Camel, Ltd.*, 390 N.E.2d 393, 405 (Ill. App. 1979) (citations omitted); see also *Roda v. Berko*, 81 N.E.2d 912, 916 (Ill. 1948) ("where there is an intentional and deliberate fraud … it is not the privilege of the perpetrator of the fraud to interpose the defense that the one defrauded was not sufficiently careful to discover the fraud and prevent its accomplishment"); see also *Williams Electronics Games, Inc. v. Garrity*, 366 F.3d 569, 573 (7th Cir. 2004) (same). In light of *Continental Concrete Pipe* and *Teamsters Local 282*, this is true whether the defrauding party seeks complete relief from liability or only partial relief from

---

*Carr Futures, Inc v. Commodity Futures Trading Comm'n*, 27 F.3d 1260, 1265 (7th Cir. 1994), quoting *Teamsters Local 282*, 762 F.2d at 529. In those instances, the fraud victim already knows about a misrepresentation and decides not to object to it. Investors cannot act on a known misrepresentation "and later claim deception," or rely "upon an isolated oral variance contradicting" information they know to be true, or claim deception regarding "things actually known to the investor equally or better than to the speaker." *Id.* at 1266. We have also applied this actual knowledge analysis when futures commission merchants point to the customer's faulty "due diligence" as a defense. See *DeRance, Inc. v. PaineWebber Inc.*, 872 F.2d 1312, 1322–23 (7th Cir. 1989) (discussing *Teamsters Local 282*). Inquiry notice, in the form of a pile of mail, is not enough to impose new responsibilities on a fraud victim as a matter of law.

Case: 1:12-cv-06410 Document #: 181-1 Filed: 10/29/18 Page 42 of 42 PageID #:3672
Case: 1:12-cv-06410 Document #: 175 Filed: 09/21/18 Page 31 of 31 PageID #:3610
Case: 16-3860    Document: 00713289379    Filed: 09/20/2018    Pages: 31

Nos. 16-3860, 16-3903, 16-3967 & 17-2100                    31

the full measure of damages.[13] Because the district court held
Carter and Ten Sleep to the wrong legal standard for mitiga-
tion of damages, that portion of the district court's judgment
must be reversed and remanded for recalculation of Ten
Sleep's damages, and a supplemental fee award for appellate
work may be needed.

The judgment of the district court as to the parties' liabili-
ties and its award of attorney fees are AFFIRMED. The district
court's award of damages to Ten Sleep is REVERSED because
of the erroneous reliance on the doctrine of mitigation of dam-
ages, and on that issue, we REMAND the case for further pro-
ceedings consistent with this opinion.

---

[13] Neither the RJO agreement's insistence on prompt action in re-
sponse to erroneous statements nor *Anspacher* operate to change this con-
clusion. See above at 19–23. Only in situations like *Shapiro*, where the cus-
tomer had actual knowledge of the years of unauthorized activity, see 569
P.2d at 271, and troubling situations like *Anspacher*, where the customer
decided to "wait[] to see the results of those [unauthorized] trades," see
854 F.2d at 942, should the law make a customer responsible for losses
created by a broker's fraud.