**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

STRAITS FINANCIAL LLC,

Plaintiff,

v.

TEN SLEEP CATTLE CO. and RICHARD CARTER,

Defendants.

TEN SLEEP CATTLE CO. and RICHARD CARTER,

Counter-Plaintiffs and Third-Party Plaintiff,

v.

STRAITS FINANCIAL LLC,

Counter-Defendant,

and

JASON PERKINS,

Third-Party Defendant.

Case No. 1:12-cv-06110

Honorable Manish Shah

**TEN SLEEP CATTLE CO. AND RICHARD CARTER'S REPLY IN SUPPORT OF MOTION FOR ENTRY OF JUDGMENT**

After six and a half years of litigation and appeals, Ten Sleep is finally on the verge of collecting over $2 million in damages Straits inflicted with its unauthorized trading. But Straits has proven once again that it will do everything possible to prolong this case and the very real financial pain it has inflicted on Ten Sleep and Richard Carter.

The sole remaining issue in this case relates to the $214,709.01 balance of the 35 Account as of March 16, 2012; *i.e.*, whether Ten Sleep is entitled to all of it, or whether Straits get to keep half of it. Straits argues that is entitled to keep half the money ($107,354.01) because Perkins and Carter had agreed to let Perkins trade the 35 account and split the profits between them. But Straits blithely ignores the fact that Perkins was prohibited from duping Carter into making that agreement in the first place. Perkins' own counsel said it best at the beginning of his closing argument:

> Jason Perkins violated the rules of the Chicago Mercantile Exchange, or the CME group, he violated the NFA rules, and he violated Straits Financial's own rules when he verbally agreed to trade the 35 account that we've been discussing in this case. Jason Perkins also violated his employment agreement with Straits when he agreed to share in the profits in the trading in the 35 account with Richard Carter.

Trial Tr. 945, Sept. 11, 2014 (Dkt. # 147). The Seventh Circuit noted these issues as well:

> Perkins did not tell Carter that their profit-sharing agreement ran afoul of Straits Financials policies and commodities industry rules. Nor did Perkins inform Carter that it was against Straits financials policies and industry rules to open a discretionary account without written authorization. Perkins also did not disclose these undocumented aspects of the new account to Straits Financial. At trial, Perkins admitted these policy and rule violations.

7th Cir. Op., Dkt. #175 at 5 n.2 (citations omitted).

Despite Perkins' admissions, and without citing any legal authority, Straits now seeks to stand in Perkins' shoes and "enforce" the illicit bargain he made with Carter. Straits' argument should be rejected out of hand, just on the basis of sheer audacity.

At the risk of giving credit to Straits' arguments where none is due, there are several compelling reasons why Straits' last-minute cash grab should be rejected. First, Straits has never raised this argument before and has therefore forfeited it. Moreover, Straits' claim to that money is predicated entirely on the faulty assumption that Perkins' "contract" with Carter is enforceable, which it is not. Perkins did not even have the gall to make the argument Straits is making, which says a lot.

Straits makes no attempt to establish the existence of a valid profit-sharing agreement between Perkins and Straits, which is not surprising given Perkins' admissions and the Seventh Circuit's findings. Nevertheless, Straits argues that if Perkins had followed Carter's instructions on March 16, 2012 to "shut it down" and send him the proceeds, Carter would not have gotten the entire $214,000 because half would have gone to Perkins. (Straits' Oppo. at 3.) However, Straits ignores the fact that Perkins lied to Carter and breached their "contract" when he kept $214,000 in the 35 Account and used it to continue trading without Carter's knowledge or authorization, until he gambled it all away. Perkins deceived Carter and breached their purported agreement, which further defeats any claim Straits could possibly have to keep any

portion of the $214,000. The money in the 35 Account as of March 16, 2012—all of it—belongs to Ten Sleep.

**A. Straits has forfeited any argument that it is entitled to keep any portion of the equity that was left in the 35 Account on March 16, 2012.**

At trial, in post-trial briefing and on appeal, Straits has consistently argued that the proper measure of damages in this case is the entire value of the 35 Account on March 16, 2012, plus the liquidation value of the 33 Account[1] on whatever date the court chose to cut off Ten Sleep's damages. (*See, e.g.*, Straits' Submission re: Damages and Prejudgment Interest per the Court's Order of May 24, 2016 (Dkt. #108), attached as Exhibit A.) Straits has never until now challenged Ten Sleep's entitlement to the entire $214,709.01 balance of the 35 Account as of March 16, 2012—not during trial, post-trial briefing, on appeal or in its petition for rehearing after it lost the appeal. Straits has therefore forfeited this argument. *United States v. Pankow*, 884 F.3d 785, 790 (7th Cir. 2018).

**B. Straits is not entitled to enforce the purported agreement between Carter and Perkins.**

Straits claims that it is entitled to half the money left in the 35 Account on March 16, 2012 based on the profit-sharing "contract" Perkins persuaded Carter to make. (Straits' Oppo. at 5.) Straits never explains why it is entitled to assert Perkins' purported

[1] Both sides have at times made the mistake of using the liquidation value of the 35 Account (instead of the 33 Account) as of the cut-off date, which has now been established as June 20, 2012 as a result of the Seventh Circuit ruling. The parties agree that the appropriate measure of damages includes the liquidation value of the 33 Account (*not* the 35 Account) as of June 20, which was $1,823,168.77. (*See* Ten Sleep's Stip. Regarding Damages, Dkt. #186 at 2; Straits' Oppo. at 3, Dkt. #188 at 3, 5.)

contract rights. As Perkins admitted, and the Seventh Circuit confirmed, the profit-sharing agreement violated Straits' own employment agreement with Perkins, along with Straits' policies and CME rules. As such, the so-called agreement is void. *See U.S. Nursing Corp. v. St. Joseph Med. Ctr.*, 39 F.3d 790, 792 (7th Cir. 1994 (contract between nursing agency and hospital was void because agency was not licensed at time parties entered into contract); *Brandt v. Carlson*, 231 B.R. 640, 652 (N.D. Ill. 1999) (lawyer fee-sharing agreement without client's prior written consent violated Illinois Rules of Professional Conduct and was therefore void).

Even if it were possible to overlook the issue about whether Perkins and Carter actually formed a valid contract, Straits then must grapple with the fact that Perkins—whose "contractual rights" Straits seeks to enforce—breached the agreement. On March 16, 2012, Perkins told Carter he had made a $300,000 profit, and Carter told Perkins to send him a check for $300,000 and close out the account. (Findings of Fact, Dkt. #83 at ¶16.) Carter had no idea that Perkins held back $214,000, because Perkins lied. And by lying to Carter about the actual amount of profits, and disregarding Carter's instructions to send him the funds in the 35 Account, Perkins breached the purported contract, which defeats his (and therefore Straits') right to enforce it. Of course, as indicated above, the Court need not even get to this argument because the agreement was void and unenforceable to begin with. In sum, Straits' has no contractual basis to

claim any part of the $214,000 that Perkins left in the 35 Account after Carter told him to shut it down.

**C. Straits has no equitable claim to the leftover funds in the 35 Account.**

There is no dispute about the fact that Ten Sleep supplied all of the capital that Perkins used to trade in the 35 Account. Notably, Straits has always insisted that the ***losses*** are solely Ten Sleep's and Carter's responsibility.[2] But in the eleventh hour of this long litigation, Straits has decided to hold up the final reckoning by claiming it is entitled to half the ***profits*** generated with Ten Sleep's capital. Straits' argument is truly audacious.

Straits tries to pull some equitable strings by complaining that as a clearing member of the CME, it had to "make good on" the debit caused by its employee and branch manager, Jason Perkins. Straits does not mention, however, that it made quite a lot of money on the 35 Account—at least $122,610 in commissions. (Jt. Ex. 22, Dkt. #154-1 at 30-43.) This sum includes $67,000 in commissions ***after*** Carter told Perkins to stop trading. (*Id.* 41-43.) Not to mention, Straits also charged Ten Sleep $7,475 in commissions when it liquidated the 33 Account on June 20, 2012 to confiscate the equity and apply it to the debit balance in the 35 Account. (*Id*. at 43.)

The undisclosed profits in the 35 Account belong to Ten Sleep, not Straits.

---

[2] Indeed, Straits never even claimed that Perkins was liable for any of the losses.

## Conclusion

After six and a half years, this case comes down to a dispute over approximately $107,000 dollars. This is not a trivial amount of money to Ten Sleep and Carter. As much as Ten Sleep and Carter are eager to bring this case to a close and finally recover their damages, they cannot capitulate to Straits' claim to half of the $214,709.01 in the 35 Account, which Perkins hid from Carter and used to support his unauthorized trading spree.

Giving Straits half the leftover profits in the 35 Account would be patently unfair to the victims in this case, Ten Sleep and Carter. It would be tantamount to endorsing Perkins' illicit profit-sharing agreement. It would sanction Perkins' lies to Carter about the actual amount of money that was in the 35 Account as of March 16, 2012. And it would reward Straits with profits generated through the use of Ten Sleep's capital, on top of the hefty commissions Ten Sleep paid to Straits.

For the reasons set forth above, Ten Sleep Cattle Co. and Richard Carter respectfully request that this Court enter judgment in their favor, as follows:

| Damages | $2,037,877.78 |
|---|---|
| Prejudgment interest | 286,154.33 |
| Post-judgment interest[3] | 31,652.37 |
| Attorneys' fees | 478,032.70 |
| Supplemental attorneys' fees | TBD[4] |
| TOTAL | $2,833,717.18 |

Dated: November 15, 2018

Respectfully submitted,

*/s/ Nancy L. Hendrickson*
One of the attorneys for Ten Sleep Cattle Co. and Richard Carter

Nancy L. Hendrickson
ARDC No. 6207710
KAUFMAN DOLOWICH & VOLUCK
135 S. LaSalle St. Suite 2100
Chicago, IL 60603
(312) 863-3662
nhendrickson@kdvlaw.com

[3] Calculated as of November 15, 2018. Straits owes an additional $41.93/day thereafter, until paid in full.

4 Ten Sleep will supplement its fee petition to include work performed in connection with this (hopefully) final round of briefing.

**CERTIFICATE OF SERVICE**

Nancy L. Hendrickson, an attorney, hereby certifies that on November 15, 2018 she caused a copy of ***Ten Sleep Cattle Company's and Richard Carter's Reply in Support of Motion for Entry of Judgment*** to be served via the Court's ECF/electronic mailing system upon:

Howard J. Stein
Attorney at Law
70 West Madison Street
Suite 2100
Chicago, IL 60602
hsteinlaw@aol.com

James McGurk
10 South LaSalle Street
Suite 3300
Chicago, IL 60603
james@jamesmcgurklaw.com

/s/ Nancy L. Hendrickson